# ALLEN *v.* CORE TARGET CITY YOUTH PROGRAM ET AL.

[No. 116, September Term, 1974.]

*Decided May 29, 1975.*

The cause was argued before SINGLEY, SMITH, DIGGES, LEVINE, ELDRIDGE and O'DONNELL, JJ.

*Dennis W. Carroll*, with whom was *Dennis M. Sweeney* on the brief, for appellant.

*Diana G. Motz, Assistant Attorney General*, with whom were *Francis B. Burch, Attorney General*, and *Joel J. Rabin, Assistant Attorney General*, on the brief, for appellees.

O'DONNELL, J., delivered the opinion of the Court.

The claim of the appellant, Claudine Allen, for unemployment compensation benefits comes before this Court after three adverse administrative determinations and the affirmance of those proceedings in her unsuccessful appeal to the Superior Court of Baltimore City.

The appellee, CORE Target City Youth Program, operates a federally funded vocational program designed to train people for "jobs in the business world," offering courses in clerical skills, offset printing and building maintenance and repair.

In July 1971 the appellant, who had earned 96 credits as an English major toward her collegiate degree, was employed at an annual salary of $9,000 by the appellees as an instructor "in clerical skills," teaching English, business mathematics, office machines, office practices and filing.

Between March and May 1972 she served as a coordinator to review curriculum and develop course outlines in preparation for a proposal to be submitted by CORE to the federal government for future funding. She resumed her status as a clerical skills instructor in May for the ensuing teaching cycle.

Learning that the instructor in mathematics, English and black history was leaving the program she initiated a request, on October 16, 1972, to be transferred to the printing unit. Although her request was initially denied, assurances by her that she could master the job persuaded the program authorities to grant her the transfer and she became an instructor in that unit. Although her salary remained the same, she was placed on a "part-time schedule," working from 1 p.m. to 5 p.m. in that department as a supportive education instructor.

Upon the grant of the transfer the supervisor in the printing department, Arnold Allen, informed the appellant that she would be required to research certain subjects relating to printing — specifically: cost estimation, printing salesmanship, printing management, printer's English and printer's math — and to develop lesson plans for teaching these subjects. Although Allen supplied her with no source material or bibliography, she agreed, using the general outline provided by him, to research these subjects and to prepare lesson plans to instruct in them in the teaching cycle beginning January 1973.

Recognizing that the appellant possessed no knowledge of the "technical aspects" of these subjects the supervisor apprised her that the subjects, as set forth in the outline, "dealt with basics — generalities;" that he did not consider it either feasible or practical to expect her to go into depth, particularly on the subject of cost estimation, but rather expected her to be able to simply present to the students an "idea of what went into cost estimation and how to develop the cost of a [printing] job."

At the commencement of her efforts to prepare herself for her new duties she consulted with instructors in

photolithography, printing and graphics at CORE without being able to obtain any assistance from them. She visited the library, phoned people employed in the printing industry and discussed the situation with a professor of vocational education at Morgan College, who reportedly told her that one needed years of experience in the printing field to be able to teach such subjects. Finding herself unable to develop even outlines of the courses because she found the information obtained from the library too technical to be understood by her, she approached her supervisor with her predicament in mid-November and he ordered for her a textbook in "cost estimation." Although the appellant read it twice she professed that she "could not understand" the text material.

Despite the preparatory period which commenced in October, when her supervisor, in early January, on the threshhold of the beginning of the course, inquired concerning her preparation for the teaching of these subjects she told him that she did not have adequate materials for teaching the course, that the texts she had were too technical for her comprehension and that she judged herself as not possessing an adequate expertise. Although Allen attempted to reassure her that she was not expected to teach the technical aspects of the assigned subjects — since neither the element of time nor the educational level of the students would permit such discussion — she was adamant in her position of her inability to prepare herself, complaining that the course material was so technical one needed years of experience to be able to teach it, which would justify a higher salary, and that if she taught the course "she wanted more money." Allen's only retort at this confrontation was that "the course had to be taught," and he suggested a meeting with the project director and project coordinator in connection with the position maintained by the appellant. When such a meeting came to pass on January 18th the appellant restated her inability to teach the subjects and declared that she would be unable to do any further research in connection with the work because she would be enrolled in the February semester at Morgan College.

On January 24th the appellant's academic tenure at CORE's school was terminated. By letter which chronologically reviewed the events and which pointed out that she had been assigned her new duties upon her representation that she was capable of giving such instructions in accordance with the curriculum outline, the school found that she had exhibited an "apparent unwillingness to make a minimum effort in attempting to teach the course," which left "no alternative but to terminate [her services]." A replacement instructor was found who, on short notice, assumed her role and proved able to sufficiently research and teach those printing course subjects.

When the appellant filed a claim under the provisions of Maryland Code (1957, 1969 Repl. Vol.) Art. 95A, § 7, for unemployment insurance benefits her claim was denied by a claims examiner of the Employment Security Administration who found that she had "voluntarily quit her job without good cause," within the meaning of Art. 95A, § 6 (a), and imposed a maximum penalty resulting in a bar to the appellant of the receipt of such benefits. Aggrieved at this threshold administrative decision the appellant, pursuant to § 7 (e), appealed the denial of benefits to an appeals referee. After an evidentiary hearing in which the appellant, the graphics instructor whom she had consulted, her supervisor and the project coordinator testified, the referee found that despite the "employer's assurance to the claimant that she was expected to, in effect, 'give the highlights' of the subjects and not teach them in depth were to no avail, the claimant continued in her refusal to teach the subjects." In sustaining the determination of the claims examiner, the referee found that the appellant "voluntarily left her employment, without good cause, within the meaning of Section 6 (a) of the Maryland Unemployment Insurance Law, when she followed her own evaluation of the job situation, rather than attempting to comply with the employer's requirements."

Next the appellant invoked the provisions of Art. 95A, § 7

(f), and requested a review before the Board of Appeals of the Employment Security Administration where, following a *de novo* hearing, the Board adopted the referee's findings of fact and affirmed the decision denying her benefits. Aggrieved at her failure to obtain administrative relief the appellant, pursuant to Art. 95A, §7 (h), appealed the Board's decision to the Superior Court of Baltimore City where Judge Harry A. Cole, upon the record, memoranda and argument of counsel, affirmed the decision. Judge Cole, finding from the record that she was "directed to prepare herself so that she could impart certain information to the students whom she was going to teach [and] was not expected to give a technical dissertation . . . but to develop broad guidelines and present this information as best she could," concluded "that by the pattern of her actions, in the light of the request made of her, that she, without good cause, refused to work, and by her own actions provoked her discharge and voluntarily quit without good cause." From Judge Cole's affirmance of the decision of the Board of Appeals the appellant seasonably appealed to this Court.

The scope of judicial review is fixed by the provisions of Art. 95A, § 7 (h), which states, *inter alia*, that: "In any judicial proceeding under this section, the findings of the Board of Appeals as to the facts, if supported by evidence and in the absence of fraud, shall be conclusive, and the jurisdiction of said court shall be confined to questions of law." This test has been consistently applied in our decisions. *See Rogers v. Radio Shack*, 271 Md. 126, 129-30, 314 A: 2d 113, 116 (1974); *Watkins v. Employment Sec. Adm.*, 266 Md. 223, 225, 292 A. 2d 653, 654 (1972); *Barley v. Md. Dept. of Employment Security*, 242 Md. 102, 105-06, 218 A. 2d 24, 26 (1966); *Bethlehem Steel Co. v. Bd. of Appeals*, 219 Md. 146, 150, 148 A. 2d 403, 406 (1959); *Employment Security Bd. v. LeCates*, 218 Md. 202, 207, 145 A. 2d 840, 843 (1958); *Mitchell, Inc. v. Md. Employment Security Bd.*, 209 Md. 237, 240, 121 A. 2d 198, 199 (1956). Thus, in the absence of an allegation of fraud — not present here — the findings of fact of the Board's referee if supported by evidence, and adopted and affirmed by the Board, were conclusive upon

the Superior Court of Baltimore City and are binding upon us. *Watkins v. Employment Sec. Adm., supra,* at 225.

The appellant does not dispute the factual findings made by the referee, as adopted and affirmed by the Board, but, conceding . the existence of evidence to support those conclusions, argues that such facts do not support the legal conclusion that she "voluntarily left her employment, without good cause." Hence the sole question presented to us is whether the lower court and the Board of Appeals erred, as a matter of law, upon the factual findings, in applying the provisions of Art. 95A, § 6 (a), to disqualify the appellant for unemployment benefits.

The Unemployment Insurance Law is a remedial statute intended to prevent economic insecurity and to alleviate the consequences of involuntary unemployment and economic distress. *Waters v. State ex rel. Md. Unemployment Ins. Fund,* 220 Md. 337, 346-47, 152 A. 2d 811, 815-16 (1959); *State ex rel. Employment Sec. Bd. v. Rucker,* 211 Md. 153, 159-60, 126 A. 2d 846, 850 (1956); *Steamship Trade Ass'n v. Unemployment Comp. Bd.,* 190 Md. 215, 222, 57 A. 2d 818, 821 (1948). *See also Saunders v. Md. Unemployment Comp. Bd.,* 188 Md. 677, 681, 53 A. 2d 579, 581 (1947); *Md. Unemployment Comp. Bd. v. Albrecht,* 183 Md. 87, 94, 36 A. 2d 666, 670 (1944). As a remedial law it should be construed, if possible, to accomplish its objective of alleviating economic distress, and be liberally construed in favor of carrying out its purpose. *Warren v. Bd. of Appeals,* 226 Md. 1, 15, 172 A. 2d 124, 130 (1961); *State ex rel. Emp. Sec. Bd. v. Rucker, supra; Md. Unemployment Comp. Bd. v. Albrecht, supra.*

Section 2 of Art. 95A sets forth "[a]s a guide to the interpretation and application of this article, the public policy of this State" which the Act is intended to serve. The declaration of policy also set forth in § 2 states in part that "[i]nvoluntary unemployment is . . . a subject of general interest and concern which requires appropriate action by the legislature to prevent its spread and to lighten its burden which now so often falls with crushing force upon the

unemployed worker and his family." The Legislature further declared, in § 2, that in its considered judgment the public good, and the general welfare of the citizens of this State require the enactment of this measure "for the compulsory setting aside of unemployment reserves to be used for the benefit of persons *unemployed through no fault of their own.*" (Emphasis supplied.) *See Waters v. State ex rel. Unemployment Ins. Fund, supra.*

The negative words in § 2, "through no fault of their own," included in the declaration by the Legislature cannot be construed as establishing an affirmative disqualification for "fault" without regard to the other express provisions in § 6 of the Act, providing disqualification for benefits. *Fino v. Md. Emp. Security Bd.*, 218 Md. 504, 507, 147 A. 2d 738, 740 (1959); *Tucker v. American Smelting & Refining Co.*, 189 Md. 250, 258, 55 A. 2d 692, 695 (1947).

In connection with the intention of the General Assembly that those "unemployed through no fault of their own" should be entitled to benefits under the Act, the legislative scheme, in § 6, lays down criteria for the disqualification for such benefits: as to those who leave their work voluntarily without good cause (§ 6 (a)); those discharged for gross misconduct connected with their work (§ 6 (b)); those discharged or suspended as a disciplinary measure for misconduct other than gross connected with their work (§ 6 (c)); those who fail, without good cause, either to apply for available, suitable work or to accept suitable work when offered or to return to their customary employment (§ 6 (d)); those who become unemployed as a result of stoppage of work because of labor disputes, under certain conditions (§ 6 (e)); and those physically unable to continue employment because of pregnancy (§ 6 (f)).[1] *See Waters v. State ex rel. Md. Unemployment Ins. Fund, supra,* at 349, 152 A. 2d at 817. Section 17 (e) affords an additional basis for disqualification when a claimant is found to have made a false statement or representation or failed to disclose a

---

1. Maryland Code (1957, 1969 Repl. Vol. [1974 Cum.Supp.]) Art. 95A, § 6 (f) as amended by Ch. 652 of the Acts of 1973.

material fact in order to obtain or gain an increase in any benefit or other payment under the Act. *See State ex rel. Emp. Sec. Bd. v. Rucker, supra,* at 157, 126 A.2d at 848-49.

The term "leaving work voluntarily" is not anywhere defined in the statute and absent some imperative reason for enlarging its meaning the term "should be construed as having its ordinary and commonly-accepted meaning." *See Scoville Service, Inc. v. Comptroller,* 269 Md. 390, 395, 306 A. 2d 534, 537 (1973).

What our predecessors stated in connection with construing the provisions of the Unemployment Insurance Law in *Celanese Corp. of America v. Davis,* 186 Md. 463, 47 A. 2d 379 (1946) (where it was held that the appellant was not exempt from the taxing provisions of the statute) seems here particularly apposite. Judge Collins, writing for the Court, stated:

> "It is a primary rule of statutory construction that statutes should be construed to effectuate the intention of the Legislature. The meaning and intention must first be sought in the language of the statute itself. If that language is plain and free of ambiguity and has a definite and sensible meaning, such is conclusively presumed to be the meaning of the Legislature in enacting the statute. **The courts are not at liberty to gather a legislative** intention contrary to the plain words of the statute or to insert words to express an intention not shown in the original form. The court is justified in disregarding the natural import of the language only when some imperative reason is found in a statute for enlarging or restricting its meaning. *Wilson v. State,* 21 Md. 1; *Roach v. Jurchak,* 182 Md. 646, 652, 35 A. 2d 817." 186 Md. at 470, 47 A. 2d at 383.

*See also Saunders v. Unemp. Comp. Bd., supra;* and *Tucker v. American Smelting & Refining Co., supra.*

The phrase "leaving work voluntarily" cannot by construction be extended so as to make it applicable to any case which is not shown to be clearly within the contemplation of the Legislature. *See Maryland Unemployment Comp. Bd. v. Albrecht, supra.*

Webster's New International Dictionary of the English Language, at 2858 (2d ed. 1944), defines "voluntary" as: "1. Proceeding from the will, or from one's own choice or full consent; produced in or by an act of choice; . . . . 2. Unconstrained by interference; unimpelled by another's influence; spontaneous; acting of oneself; free . . . 3. a. Done by design or intention; intentional; purposed; intended, not accidental . . . b. Made or given of one's own free will; . . ." Black's Law Dictionary at 1746 (Rev. 4th ed. 1968), similarly defines "voluntarily" to mean "[d]one by design or intention, intentional, purposed, intended, or not accidental . . . Intentionally and without coercion." "Voluntarily" is defined in Webster's Seventh New Collegiate Dictionary at 998 (1967), as done "of one's own free will."

The Court of Appeals of Kentucky, in *Kentucky Unemployment Ins. Comm'n v. Young,* 389 S.W.2d 451, 453 (Ky. 1965), in construing their statute which denied benefits to a worker if " 'he has left his most recent suitable work voluntarily without good cause,' " held that "[T]he word 'voluntary' must certainly be defined as meaning 'freely given' and 'proceeding from one's own choice or full consent.' " *In accord, Churchill Downs, Inc. v. Kentucky Unemployment Ins. Comm'n,* 454 S.W.2d 347, 349 (Ky. 1970). Similarly, in *MacFarland v. Unemployment Comp. Bd. of Review,* 158 Pa.Super. 418, 45 A. 2d 423 (1946), where an employee entrusted with the inspection and maintenance of safety measures performed his duties with an excess of zeal amounting to officious interference in matters outside the scope of those duties and he was discharged for insubordination, it was held that he had not "voluntarily left his work" within the meaning of the Unemployment Compensation Law. That court stated:

"The board's decision that a discharge under

certain circumstances is equivalent to a voluntary relinquishment of employment is directly counter to our construction of the act. We have heretofore plainly held that the two are not the same thing, that one is the opposite of the other. 'When we say, "he left work voluntarily," we commonly mean, *he left of his own motion; he was not discharged. It is the opposite of a discharge,* dismissal or lay-off by the employer or other action by the employer severing relations with his employes, to provide against which the act was mainly designed' . . . ." (Emphasis in original) 158 Pa.Super. at 422, 45 A. 2d at 425.

In *Md. Emp. Sec. Bd. v. Poorbaugh,* 195 Md. 197, 200, 72 A. 2d 753, 754 (1950), in what appears to be the only case to come before this Court involving the issue of whether an applicant for unemployment benefits had "left work voluntarily and without good cause," the applicant admitted that he "laid off because of the cold weather." The evidence established, however, that his employer "sent him word that if he didn't report 'for work tomorrow he wasn't going to have any more work,' but he did not report [for work] until about four months later." In reversing an order of the Circuit Court for Allegany County our predecessors there held that there was evidence to support the Board's determination that the appellee, Feaster, had "voluntarily quit his job," when he, of his own volition, failed to report and thus elected not to work.

As we see it, the phrase "due to leaving work voluntarily" has a plain, definite and sensible meaning, free of ambiguity; it expresses a clear legislative intent that to disqualify a claimant from benefits the evidence must establish that the claimant, by his or her own choice, intentionally, of his or her own free will, terminated the employment. If an employee is discharged for any reason, other than perhaps for the commission of an act which the employee knowingly intended to result in his discharge, it cannot be said that his or her unemployment was due to "leaving work voluntarily."

By creating separate disqualifying provisions in § 6, the Legislature patently intended to make a clear distinction between those factual situations in which an employee is discharged and those in which he quits the job. If discharged, the relevant inquiry is whether the severance came about as a result of some act of misconduct; if he voluntarily leaves his job, the collateral issue is whether or not he left "without good cause." The issues, penalties, justification, or want of it, will all differ depending on whether the claimant in the first instance was discharged or voluntarily quit.

In this case the record does not establish that the claimant of her own volition and from her own choice undertook to terminate her services. Although it certainly cannot be challenged that her conduct precipitated her severance, based upon the factual findings that she contumaciously refused to prepare herself to perform the duties she had undertaken, the record clearly demonstrates that the employer was the party who elected to and did, in fact, terminate the relationship when she was discharged. She did not quit or otherwise "voluntarily" leave.

In view of the plain meaning of the statutory language, and the clear intention of the Legislature, we cannot conclude, as a matter of law, upon the factual findings made by the referee, as adopted and affirmed by the Board, that the appellant's unemployment was "due to [her] leaving work voluntarily, without good cause." We hold that the factual circumstances resulting in her termination did not bring her case within the provisions of Art. 95A, § 6 (a). To construe the statute otherwise would render the distinction maintained by the Legislature between unemployment due to "leaving work voluntarily" and unemployment resulting from discharge as completely meaningless and the Legislature, in our view, did not intend such a result.

In urging affirmance the appellees advocate the adoption by us of the doctrine of "constructive voluntary leaving" apparently invoked by the referee and adopted by the Board, or the doctrine of "provoked discharge" as apparently

accepted by the trial court, neither of which theses does it appear from our decisions to have before been accepted by this Court.

Notwithstanding the statutory chasm between leaving work voluntarily and discharge for misconduct, we can envision limited circumstances where, although the employee was shown to have been factually and technically discharged, it might be evident that he in fact undertook to terminate the employment relationship and thus be held to have "constructively" voluntarily left his employment. This is particularly true where an employee is shown to have abandoned his employment by pursuing a course of conduct which resulted in his severance from employment. *See Echols v. Employ. Sec. Comm'n*, 380 Mich. 87, 155 N.W.2d 824 (1968), where the claimant, a cab driver, had his motor vehicle operator's license — a prerequisite to his continued employment — revoked through no fault of his employer, **but as a result of his own negligence, and it was held on** such facts that he voluntarily left his employment. *See Michalsky v. Unemploy. Comp. Bd.*, 163 Pa.Super. 436, 62 A. 2d 113 (1948), where a coal miner, imprisoned for six months for the nonsupport of his family, failed during his extended absence to communicate with his employer and was replaced, it was held that the legal effect of his voluntary unemployment under the circumstances amounted to an abandonment of the employment by him. *See also Fennessy v. Unemploy. Comp. Bd.*, 184 Pa.Super. 492, 135 A. 2d 814 (1957), where the claimant, because of "cardiac stress," was advised by his physician to discontinue his work as a shearing machine operator and to seek lighter duties but who, without requesting an assignment for such lighter work from his employer, remained away from his job and it was held that his failure to advise his employer of his availability for light work resulted in him voluntarily leaving his employment.[2] Our holding in *Md. Emp. Sec. Bd. v. Poorbaugh, supra,* is in accord with this rationale.

---

2. We cite these cases only as examples of factual situations where the doctrine has been applied without here embracing their holdings.

*Compare Thomas v. Employ. Sec. Comm'n,* 356 Mich. 665, 97 N.W.2d 784 (1959), rejecting the doctrine of "constructive voluntary leaving" in a case where a claimant, arrested en route to work for driving without an operator's license and sentenced to a 15 day jail term, reported for work immediately upon his release from jail.

The Supreme Court of Michigan, in *Copper Range Co. v. Unemploy. Comp. Comm'n,* 320 Mich. 460, 31 N.W.2d 692 (1948), rejected the doctrine of "constructive voluntary leaving" where an employer, faced with financial difficulties, attempted to have his employees consent to a reduced scale of wages as an alternative to the discontinuance of a sub-marginally productive mining and smelting operation and the company suspended operations after a majority of its employees, by vote, declined to accept the wage proposal.

The holdings in *Ford Motor Co. v. Abercrombie,* 207 Ga. 464, 62 S.E.2d 209 (1950), *Moen v. Director, Div. of Employ. Sec.,* 324 Mass. 246, 85 N.E.2d 779 (1949), *Anson v. Fisher Amusement Corp.,* 254 Minn. 93, 93 N.W.2d 815 (1958), *Jackson v. Minneapolis-Honeywell Reg. Co.,* 234 Minn. 52, 47 N.W.2d 449 (1951), *Amuchastegui v. Dept. of Employ.,* 4 Ore.App. 456, 479 P. 2d 526 (1971), *Dept. of Labor & Industry v. Unemploy. Comp. Bd.,* 418 Pa. 471, 211 A. 2d 463 (1965),[3] and *In re Buffelen Lumber & Mfg. Co.,* 32 Wash.2d 205, 201 P. 2d 194 (1948), each of which is cited by the appellees in support of the application of the doctrine of "constructive voluntary leaving" are here factually inapplicable since in each of them the claimant's unemployment was held to have been "voluntary" as a direct result of the effect of a collective bargaining agreement, to which he was subject, upon his employment.

*See generally* 76 Am.Jur.2d *Unemployment Compensation* § 59 (1975), concerning the doctrine of "constructive voluntary leaving."

Assuming that the doctrine of "constructive voluntary leaving" would be applicable under appropriate

---

3. *See* 26 Md. L. Rev. 205-06 (1966).

circumstances, it is self-evident that the facts in this case do not bring it within that doctrine.

Nor, in our view, do the facts bring the case within the doctrine of "provoked discharge" which had its origin not in the statute, but in *In re Malaspina*, 309 N.Y. 413, 131 N.E.2d 709 (1956), and the special kind of discharge involved in that case. There an employee was discharged because the employee had refused to join the union in an agency shop under a collective bargaining agreement; the act of the employee in refusing to join the union was voluntary. The act of the employer was compelled by its obligation under the collective bargaining agreement. It was held in *Malaspina* that under such circumstances the employee, who had known of the requirement of joining the union before employment, and who was fully aware of the inevitable consequences of his refusal, had voluntarily left his employment by "provoking his discharge."

Although the doctrine has been upheld in a number of intermediate appellate decisions in New York, *see In re Karman*, 2 App.Div.2d 626, 151 N.Y.S.2d 817 (3d Dept. 1956) (where an assistant bookkeeper, instructed by his employer to make certain entries, refused because "he considered it beyond the duties of his job and felt the head bookkeeper should make them," and was discharged); and *Asaro v. Catherwood*, 32 App.Div.2d 699, 299 N.Y.S.2d 907 (3d Dept. 1969) (where an employee hired to do "outside sales work" thereafter refused to perform and was discharged), the Court of Appeals of New York in the recent case of *James v. Levine*, 34 N.Y.2d 491, 358 N.Y.S.2d 411, 315 N.E.2d 471 (1974), thoroughly examined the doctrine of "provoked discharge," disapproved its extension by the New York courts and severely limited its application.

After pointing out that *Malaspina* arguably "was a legitimate and essential gloss on the statute to fill a gap . . . [and] [i]t did not purport to, nor might it, create a third and distinct category for determining temporary ineligibility for unemployment insurance benefits," Chief Judge Breitel, for the court, stated:

"Among other jurisdictions, there has always been disagreement whether one who effects his own discharge by indirection may be deemed to abandon his employment "voluntarily". *The doctrine is a fiction in most cases, the real cause of discharge being misconduct.* Some jurisdictions refuse to recognize the category of "constructive voluntary leaving" (see 81 C.J.S. Social Security and Public Welfare § 164, at p. 250; see, . also Ann., Unemployment Compensation — Union Acts, 90 A.L.R.2d 835, 837). It would seem that the doctrine arose largely within the context of union activities and collective bargaining agreements, where special policy considerations were at work. Certainly those special concerns account, in large measure, for the *Malaspina (Carsi)* (309 N.Y. 413, 131 N.E.2d 709, *supra*) result (see Ann., Unemployment Compensation — Union Acts, *op. cit., supra).* For the large majority of cases, *consideration of eligibility under the rubric of misconduct leads to more sensible analysis and resolution. More important, the statute requires it.*" (Emphasis supplied.) 34 N.Y.2d at 496, 358 N.Y.S.2d at 414, 315 N.E.2d at 473-74.

After reviewing the facts as to each of the claimants and affirming their disqualifications because they were respectively clearly shown to have been guilty of misconduct, it was further stated by the court:

"In summary, each of the cases demonstrate the inappropriateness of the provoked discharge doctrine, where the employer may or may not choose to discharge the unsatisfactory employee. Matter of Malaspina (Corsi) (309 N.Y. 413, 131 N.E.2d 709, *supra*) should be *confined to the instance of the 'involuntary' discharge by an employer for cause flowing from the 'voluntary' act or acts of the employee.* Causes for discharge which do not attain the level of misconduct may not be

used to render claimants ineligible for benefits. Voluntary separation should, except perhaps in the unusual situation of the *Malaspina* case, be confined to the giving up of employment permanently or temporarily, without cause of justification." 34 N.Y.2d at 498, 358 N.Y.S.2d at 416, 315 N.E.2d at 475.

We fully concur with the views expressed in *James v. Levine, supra,* that the doctrine of "provoked discharge" is fictional where the real cause for discharge is misconduct, and that its applicability should be limited to those cases factually similar to the holdings in *Malaspina, supra,* and we hold that our statutory scheme — similar to that of New York — does not allow for a third and distinct hybrid category for disqualification of unemployment benefits. We conclude that the application of the doctrine to the facts in the instant case would be clearly inappropriate.

Secondarily, the appellant argues that she was not discharged for either "gross misconduct" as defined in § 6 (b), or "misconduct" within the provisions of § 6 (c), and suggests that we, should we find that her unemployment is not "due to [her] leaving work voluntarily, without good cause," should direct that benefits be awarded her.

The term "gross misconduct," as spelled out in § 6 (b), "include[s] conduct of an employee which is (1) a deliberate and willful disregard of standards of behavior, which his employer has a right to expect, showing a gross indifference to the employer's interest, or (2) a series of repeated violations of employment rules proving that the employee has regularly and wantonly disregarded his obligations." That section was applied in *Watkins v. Employment Sec. Adm., supra,* where persistent absenteeism was held to constitute "a deliberate and willful disregard of standards of behavior, which [the] employer has a right to expect, showing a gross indifference to the employer's interest." In *Employment Security Bd. v. LeCates, supra,* the claimant was found to have been guilty of "deliberate and willful misconduct" — the test under an earlier version of the

statute — in connection with a series of events resulting from the unauthorized use of a company truck. *See also Ostrofsky v. Md. Employ. Sec. Bd.*, 218 Md. 509, 147 A. 2d 741 (1959), where the claimants' refusal to answer questions at a company hearing (concerning their past and present connections with the Communist Party) was held to be "deliberate and willful misconduct" in connection with their work. *Compare Fino v. Md. Employ. Sec. Bd.*, 218 Md. 504, 147 A. 2d 738 (1959), where the claimant's asserted misconduct was not "misconduct connected with [her] work."

The term "misconduct" (other than gross) is undefined in § 6 (c). In *Rogers v. Radio Shack, supra,* where we held that the conduct of the claimant, under the circumstances there set forth, did not "intrinsically constitute a forbidden or wrongful act or dereliction of duty," we set forth the definition of "misconduct" as used by the Board of Appeals without undertaking to circumscribe or enlarge it.

*See Cohen v. Catherwood,* 25 App.Div.2d 906, 269 N.Y.S.2d 541 (3d Dept. 1966), involving "gross insubordination" on the part of a teacher.

*See also* Annot., 26 A.L.R.3d 1333 (1969), *Unemployment Benefits — Disobedience* (Insubordination as misconduct) and Annot., 26 A.L.R.3d 1356 (1969), *Unemployment Compensation — Misconduct* (Work-connected inefficiency or negligence as misconduct). *See also generally* 76 Am.Jur.2d, *supra,* §§ 52-54 (1975).

The obvious answer to this collateral contention by the appellant is that although she was discharged manifestly as a result of her conduct, neither the referee, nor the Board of Appeals passed upon her disqualification for benefits under either of those sections and her contention is thus not properly before us.

Viewing the evidence in the light most favorable to the findings of fact made by the Board, *see Barley v. Md. Dept. of Employ. Sec.*, 242 Md. 102, 106, 218 A. 2d 24, 26-27 (1966), particularly those findings concerning the claimant's occupational intransigent attitude and — notwithstanding

what appears to be a sufficient level of intellectual capacity on her part — her contumacious recalcitrance to undertake to prepare herself to teach even "the highlights" of the subjects she was commissioned to teach — though purportedly she did not possess the ability to master the technical aspects of those subjects — we are required to remand the case to the Board for determination by it as to whether her provocative conduct did "constitute a deliberate and willful disregard of the standards of behavior which her employer had a right to expect and showed a gross indifference to the employer's interest," as defined in § 6 (b), or constituted "misconduct connected with [her] work," within the provisions of § 6 (c).

Although the order of the Superior Court, which sustained the finding that the appellant had "voluntarily quit her job without good cause," must be reversed, we shall direct that the case be remanded to the Board of Appeals of the Employment Security Administration, upon the facts found to exist, for a determination as to whether or not the deportment which precipitated the appellant's discharge is encompassed within the definition of "gross misconduct" or constituted other "misconduct."

> *Order reversed; case remanded with directions to remand the proceedings to the Board of Appeals in conformity with the views expressed in this opinion; costs to be paid by the appellees.*