Dear Honorable James D. Fielder, Jr., Ph.D.
You have each asked for our opinion concerning the appropriate use of funds from the Special Administrative Expense Fund ("the SAEF" or "the Fund"), a special fund administered by the Department of Labor, Licensing, and Regulation ("DLLR"). Secretary Fielder has also posed specific questions concerning the use of the SAEF to supplement federal funds received for the administration of the Maryland Unemployment Insurance Law, to pay expenses related to the occupancy, maintenance, and improvement of space used for the administration of that law, and to pay for "substituted operational costs incurred as a result of consolidation of leased space."
SAEF funds may be used for the various administrative purposes set forth in the SAEF statute. Neither the budget bill nor a budget amendment may expand those purposes. Among the purposes listed in the SAEF statute is the acquisition of space used for the administration of the Unemployment Insurance Law. While there is no specific provision in the SAEF statute that allows for the payment from the Fund of costs related to occupancy, such as utilities, maintenance, and security, in some circumstances these costs may be considered part of the cost of acquisition. Money in the SAEF may not be devoted to a use not allowed by the SAEF statute, such as operational expenses, unless the General Assembly passes a law permitting that use.
 I Background
A. Maryland Unemployment Insurance Law
Unemployment insurance is "intended to prevent economic insecurity and to alleviate the consequences of involuntary unemployment and economic distress." Allen v. Core Target City Youth Program, 275 Md. 69, 75, 338 A.2d 237 (1975). The Maryland Unemployment Insurance Law, and related regulations, provide a process by which an individual can claim unemployment insurance benefits. Annotated Code of Maryland, Labor and Employment Article ("LE") § 8-101 et seq.; COMAR 09.32.01. The law is administered by various components of DLLR.[1]
Like other state unemployment insurance laws, the Maryland statute was enacted during the Depression in response to a part of the Social Security Act that encouraged the creation of such laws. See Chapter 1, Dec. Spec. Sess., Laws of Maryland 1936; § 302 of the Social Security Act, 49 Stat. 626 (August 14, 1935) codified at 42 U.S.C. § 502; see also 48 Opinions of the Attorney General 172 (1963) (describing origin of State statute). The Federal Unemployment Tax Act sets minimum standards that states must satisfy in order to participate in the federal-state unemployment compensation scheme and receive federal funding. See 76 Am. Jur. 2d Unemployment Compensation §§ 4, 19-20. The Maryland Unemployment Insurance Law is to be construed consistently with the various federal statutes governing unemployment compensation. LE § 8-103(a).
Federal law establishes a Federal Unemployment Trust Fund, which collects and disburses funds related to unemployment compensation benefits. 42 U.S.C. § 1104. One of the accounts in that fund, known as the employment security administration account, is used to provide grants to states for the administration of unemployment compensation programs pursuant to § 302 of the Social Security Act. See 42 U.S.C. §§ 502(a), 1101(a),1101(c)(1)(A)(i); see also 20 CFR § 601.6.
Maryland law provides for the establishment of several special funds to carry out the State Unemployment Insurance Law. Among those funds are the Unemployment Insurance Fund (LE §§ 8-401 et seq.), which is used to pay benefits and refunds, and the Unemployment Insurance Administration Fund ("UIAF") (LE § 8-412
et seq.), which is used to pay various administrative costs associated with the Unemployment Insurance Law. The UIAF consists of money from a variety of sources, including amounts provided under Title III of the Social Security Act ( 42 U.S.C. § 501
et seq) and the federal Wagner-Peyser Act (29 U.S.C. § 49 et seq.). LE § 8-414(a). Federal funds and State appropriations deposited in the UIAF may be spent only in accordance with guidance of the federal Secretary of Labor. LE § 8-414(b)(2).
The subject of your inquiry is a third fund, known as the Special Administrative Expense Fund. The SAEF is to be devoted to certain administrative costs associated with the Unemployment Insurance Law, but is not subject to the federal restrictions governing use of funds in the UIAF.
B. Special Administrative Expense Fund
The SAEF is governed by LE § 8-419 through § 8-422.[2] The Fund consists of money appropriated in the State budget from fines, interest, and other penalties collected under the Maryland Unemployment Insurance Law, money transferred from the UIAF,[3]
and any voluntary contributions to the Fund. LE § 8-421(a). Expenditures from the SAEF are subject to constitutional and statutory budgetary and appropriation procedures. LE § 8-422(b). Following the end of each fiscal year, the Secretary is to direct the State Treasurer to transfer to the General Fund any balance in excess of $250,000 in the Fund that the Secretary has not been allocated in accordance with the statute. LE § 8-422(f). The statute also provides for transfers to the UIAF in certain circumstances. LE §§ 8-415(d), 8-422(d). However, money in the SAEF may not otherwise be transferred to any other fund. LE § 8-420(b)(2).
The statute specifies several purposes of the SAEF. First, it may be used as a revolving account to cover costs "that are proper under the law" for the administration of the Unemployment Insurance Law, pending federal reimbursement of those costs. LE § 8-421(b)(1).
Second, the SAEF may also be used to make payments to adjust for certain types of errors. For example, it may be used for:
(1) reimbursement of interest on contributions collected erroneously. LE § 8-421(b)(2)(i).
(2) costs of administration of the Unemployment Insurance Law that have been improperly charged against federal funds credited to the UIAF. LE § 8-421(b)(2)(ii).
(3) replacement within a reasonable time of money that the State receives under § 302 of the Social Security Act and that "because of an action or contingency has been lost or has been used for purposes other than or in amounts exceeding those necessary" for proper administration of the Unemployment Insurance Law. LE § 8-421(b)(2)(iii)1.
Finally, the Fund may be used to acquire office space "suitable for effective administration" of the Unemployment Insurance Law. LE §§ 8-421(b)(2)(iii)2, (c).
The General Assembly has placed a limitation on all these permissible uses of the Fund: the Fund should not displace federal funds that would otherwise be available to pay for the administration of the Unemployment Insurance Law. LE § 8-421(d).
On occasion, the Legislature has also conditioned the use of the SAEF in the annual budget bill. For example, the budget bill for Fiscal Year 1998 provided that:
 No funds derived from the Special Administrative Expense Fund (SAEF) shall be added to the budget through budget amendment, except as required to offset reductions in federal revenues below the level estimated in this budget, to address increased levels of unemployment, or to make critical repairs to eligible facilities. Unexpended funds in excess of $250,000 shall be transferred to the general fund as provided by law.
Chapter 3, Laws of Maryland 1997 at p. 170. See also Chapter 8, Laws of Maryland 1994 (conditioning use of Fund for local office acquisition or construction on submission of plans and cost estimates to legislative budget committees for review and comment). Such provisions are effective only during the fiscal year to which the bill applies.
C. Legislative Audit
In 2002, the Legislative Auditor found that DLLR had made improper use of the SAEF Fund for routine operating expenses, such as telecommunications. The Auditor recommended that DLLR strictly comply with law governing the SAEF in the future.[4] Audit Report concerning the Department of Labor, Licensing, and Regulation (June 2002), p. 13. DLLR objected to this finding on the basis that it relied on legal advice that SAEF funds could be used for any purpose authorized by the General Assembly. It stated that the amounts in question had been identified in budget bill documentation or were included in budget amendments that resulted from shortages of federal funding. Id., Appendix, pp. 3-4.
 II Analysis
We address first whether the budget or budget amendment process may be used to spend SAEF funds for a purpose other than one identified in the SAEF statute. We then address several specific questions that relate to the operation and use of the SAEF.
A. Transfer of SAEF Funds for Other Purposes by Budget Process
Secretary Fielder noted that attorneys in this Office have given varying interpretations about the effect of the budget process on the use of SAEF funds and requested clarification as to whether the budget process would permit DLLR to use SAEF funds for purposes in addition to those explicitly listed in the SAEF statute.
1. Use of SAEF Funds for Other Purposes under Budget Appropriation
LE § 8-422(b) states that money in the SAEF "shall be spent in accordance with appropriations in the State budget." On its face, it might appear that this provision allows SAEF funds to be spent for any purpose authorized by the General Assembly in the annual budget bill. However, the legislative history of LE § 8-422(b) demonstrates that it was enacted to clarify that the SAEF is subject to the budget and appropriations process that applies generally to moneys of the State.[5]
In any event, it is well established that, when the General Assembly establishes a special fund dedicated to specific purposes, the budget bill may only appropriate money from that fund for those specific purposes. See 20 Opinions of the Attorney General 201, 203-4 (1935). While the Legislature may condition the use of moneys from a special fund in the budget bill, it is constrained from changing the statutory uses by the prohibition against "legislating in the budget." The Court of Appeals has explained that permissible conditions in the budget bill "are directly related to the expenditure of the sum appropriated, do not amend substantive legislation or duly adopted administrative rules and are effective only during the fiscal year for which the appropriation is made." Bayne v. Secretary of State, 283 Md. 560, 576, 392 A.2d 67 (1978) (emphasis added); see also 73 Opinions of the Attorney General 43, 46-48 (1988) (recounting history of prohibition against "legislating in the budget"). "A budget bill is not a means by which the General Assembly may enlarge the scope of a statute." 81 Opinions of the Attorney General 269, 275 (1996). However, where the statutory language specifying the use of a special fund is ambiguous, budget bill language may aid in measuring the scope of the statutory restrictions. Id. at 275-76 (ambiguous phrase "transportation related purpose" could reasonably be construed to encompass stadium parking lot in light of budget bill language authorizing the use of a special fund grant for that purpose).
Thus, the budget bill cannot expand the purposes for which SAEF funds may be used. The General Assembly has specified those purposes in the Unemployment Insurance Law. The appropriation of moneys from the SAEF in the budget bill is limited to those purposes. Of course, the General Assembly may expand those purposes in separate legislation. And, to the extent that the SAEF statute is ambiguous, language in the budget bill may shed light on the meaning of that statute.
2. Use of SAEF Funds for Other Purposes under Budget Amendment
The budget amendment procedure is set forth in Annotated Code of Maryland, State Finance Procurement Article ("SFP"), § 7-209. Under that statute, an appropriation for a program of an officer or unit of the Executive Branch may be amended with the approval of the Secretary of Budget and Management and the Governor. SFP § 7-209(b).
There are several important constraints on the content of a budget amendment. While a budget amendment may change the monetary amount of an appropriation, it "may not change any language or substantive provision in the State budget." SFP § 7-210(a).
Special restrictions govern the amendment of appropriations from a special fund such as the SAEF. SFP § 7-209(c)(1)(ii) provides that "an amendment of an appropriation for a program . . . may permit the expenditure of money from a special fund . . . as provided in [SFP] § 2-201 or § 7-217(a).. . ." SFP § 2-201 pertains to the acceptance and use of gifts. The other cross-referenced provision states:
 An office or unit of the State government may spend money from a special fund . . . that is not estimated or included in the State budget or exceeds the estimate in the State budget and is paid into the State Treasury for a program after an approved amendment of a special . . . fund appropriation for the program:
 (1) for the specific purpose to which the money is dedicated by State law or act of Congress; or
 (2) if the money is not dedicated to a specific purpose, with the approval of the Governor and as authorized in an approved budget amendment, for necessary current operations.
SFP § 7-217(a) (emphasis added).[6] Thus, pertinent to the SAEF, a budget amendment may appropriate unestimated or excess receipts in a special fund "for the specific purpose to which the money is dedicated by State law" — i.e., the SAEF statute. The State budget bill reiterates this authority with respect to federal and special funds. See, e.g., Chapter 429, § 5, Laws of Maryland 2004 at p. 1797 (amounts received pursuant to SFP § 2-201 or SFP § 7-217 may be expended under an approved budget amendment); id., § 7 (receipts in excess of budget estimates for special and federal funds may be made available by budget amendment). In 71 Opinions of the Attorney General 3 (1986), Attorney General Sachs concluded that money could be transferred from one special fund — the Transportation Trust Fund — to another — the Maryland Deposit Insurance Fund Corporation — by means of the budget amendment process. At that time, State law explicitly barred transfers from the Transportation Trust Fund to the General Fund, but was silent on transfers to other special funds.[7] Attorney General Sachs relied on prior versions of SFP § 7-209 and § 7-217, as well as similar versions of §§ 5 and 7 of the budget bill,[8] and concluded that the transfer of unestimated and excess receipts was permissible.[9]
The circumstances involving the SAEF are distinguishable. Unlike the 1986 law governing the Transportation Trust Fund, the SAEF statute provides that "[e]xcept as otherwise provided in this subtitle, money in [the SAEF] may not be transferred to any other fund." LE § 8-420(b)(2) (emphasis added). Because the SAEF statute specifically prohibits transfers not otherwise authorized in the Unemployment Insurance Law, the use of SAEF funds could not be expanded by transferring the funds by means of a budget amendment.
B. Replacement of Funds Received under § 302 of Social Security Act
The SAEF statute provides that DLLR may use moneys from the SAEF:
 for replacement within a reasonable period of time of any money that the State receives under § 302 of the Social Security Act and that because of an action or contingency has been lost or has been used for purposes other than or in amounts exceeding those necessary for the proper administration of [the Unemployment Insurance Law].
LE § 8-421(b)(2)(iii)1. As noted above, § 302 of the Social Security Act provides for payments by the federal government to a state for administration of the state's unemployment compensation law.
The language of LE § 8-421(b)(2)(iii)1 was derived directly from § 303(a)(9) of the Social Security Act. 42 U.S.C. § 503(a)(9). In 1939, Congress amended § 303 of the Social Security Act to add two conditions on the certification of payments under § 302 to the states. Those conditions are now codified at 42 U.S.C. § 503(a)(8)-(9). In essence, the Social Security Board was not to certify payment to a state unless the law of the state restricted the use of the funds to the purposes designated by the federal agency and provided for "replacement" of those funds if the guidelines were violated. Thus, the Social Security Board could not certify a payment unless the state's law included provision for:
 (8) Effective July 1, 1941, the expenditure of all moneys received pursuant to section 302 of this title solely for purposes and in the amounts found necessary by the Board for the proper and efficient administration of such State law.
 (9) Effective July 1, 1941, the replacement, within a reasonable time, of any moneys received pursuant to section 302 of this title, which, because of any action or contingency, have been lost or have been expended for purposes other than, or in amounts in excess of, those found necessary by the Board for the proper administration of such State law.
These provisions were evidently designed to ensure that the funds distributed under § 302 were spent in accordance with federal guidelines and that the states would return funds to the extent that they were not spent in accordance with those guidelines.
At its next session, the Maryland General Assembly fulfilled the federal conditions by amending Article 95A, § 13(b) concerning what was then called the Unemployment Compensation Administration Fund to include language similar to the federal statute. Chapter 17, Laws of Maryland 1941 at p. 26. That provision stated that any "replacement funds" needed to fulfill the federal conditions would be appropriated from the State's general funds. In 1945, the Legislature created the SAEF as the source of replacement funds and again incorporated the language of the federal statute in Article 95A, § 13(c). Chapter 270, Laws of Maryland 1945. With respect to expenditures from the Fund, the statute provided:
The moneys in this fund shall be used by the Board for reimbursement of interest on contributions erroneously collected and the payment of costs of administration which are found not to have been properly and validly chargeable against Federal grants (or other funds) received for or in the Unemployment Compensation Fund on or after January 1, 1943. . . .[procedural provisions concerning transfer and payment of funds] . . .The moneys in this fund are hereby specifically made available to replace, within a reasonable time, any moneys received by this State pursuant to Section 302 of the Federal Social Security Act as amended, which because of any action or contingency, have been lost or have been expended for purposes other than, or in amounts in excess of, those necessary for the proper administration of the Unemployment Compensation Law. . . .
That language was ultimately recodified as LE § 8-421(b)(2)(iii)1.
It is evident that paragraph (9) of the federal statute is the source of the odd language that now appears in LE § 8-421(b)(2)(iii)1. The purpose of the federal statute was to ensure that states would repay federal funds that were not used in accordance with federal guidelines. The purpose of including this language in the SAEF statute was to identify that fund, as opposed to the General Fund, as the source of the replacement money, if the conditions in § 303 of the Social Security Act were violated.
Several questions posed by Secretary Fielder pertain to this use of the SAEF:
 Should this be accomplished through direct expenditure of SAEF funds or by transfer of SAEF funds to the UIAF?
As explained above, under LE § 8-421(b)(2)(iii)1, SAEF funds are to be used to "replace" federal funds received, but not spent in accordance with federal rules governing the use of such funds. For that purpose, SAEF funds may be paid directly to the federal government. See LE § 8-422(d)(1). In addition, the SAEF statute also allows the State Treasurer to transfer funds from the SAEF to the UIAF "for costs of administration that are found to have been improperly charged against the federal money credited to the [UIAF]." LE §§ 8-422(d)(2), 8-421(b)(2)(ii). Thus, the expenditure of SAEF funds pursuant to LE § 8-421(b)(2)(iii)1 may be accomplished by direct expenditure or by transfer to the UIAF.
Assuming SAEF funds may be used to replace systems integral to the operation of the unemployment insurance program that have reached the end of their life cycle (such as mainframe laser printers), are these expenditures best accomplished through the budget process or the budget amendment process? May SAEF be used to supplement/hire staff for purposes of increasing income to the Unemployment Insurance Trust Fund?
Because LE § 8-421(b)(2)(iii)1 concerns the "replacement" — i.e., repayment — of federal funds, we do not believe that SAEF funds would be available to purchase an item such as a mainframe laser printer or to hire additional staff, at least under that particular provision. As indicated in Part II.A. of this opinion, neither a budget appropriation nor a budget amendment can expand the permissible use of SAEF funds.
SAEF funds could be used for those purposes temporarily under another part of the statute. For example, if federal law subsidizes the hiring of such staff, money from the SAEF could be employed temporarily for that purpose until the federal funds are received. However, once the federal funding is received, the SAEF should be reimbursed. See LE § 8-421(b)(1) (use of the SAEF as a "revolving account" for costs ultimately to be paid out of federal funds).
C. Uses of SAEF Funds Related to Space Used for Administration of the Law
Secretary Fielder poses several questions concerning the costs of occupying space for the administration of the Unemployment Insurance Law. The SAEF law clearly contemplates that the Fund may be used for such costs in its capacity as a revolving fund pending federal reimbursement. See LE § 8-422(e) (authorizing temporary transfer of funds from the UIAF to the SAEF pending federal reimbursement if SAEF funds are used to "acquire, repair, or maintain" office space); LE § 8-421(b)(1) (authorizing use of the SAEF as revolving fund pending federal reimbursement). Otherwise, costs of occupancy may only be paid from the SAEF if they are part of the cost of acquiring the space.
The statute specifies how the Fund may be used to acquire office space as follows:
 Subject to subsection (d) of this section and approval by the Board of Public Works, the Secretary may use the [SAEF] to acquire office space that is suitable for effective administration of [the Maryland Unemployment Insurance Law] by:
(1) purchase;
(2) lease;
(3) construction; or
(4) use of money in the [SAEF]:
 (i) to assist the State in financing a building that the State builds for 1 of its units in which space will be provided under a lease or other contract between [DLLR] and the State or its unit;
(ii) to pay architectural fees;
 (iii) to make a deposit on a building or land; or
 (iv) for any other approved purpose that is necessary for acquisition of office space.
LE § 8-421(c). Under LE § 8-421(d), the SAEF may not be used in a manner that displaces federal funds available for administrative costs.
How do we structure these occupancy expenses such as utilities, maintenance, and security in facilities owned by the [DLLR] and used for the administration of [the Unemployment Insurance Law] to ensure that the expenses are viewed as an integral part of the cost of acquiring office space for the effective administration of [that law]?
Section 8-421(c) authorizes the use of SAEF funds to "acquire" office space. It further specifies several methods of acquisition — purchase, lease, construction. It also authorizes use of the funds for specific purposes related to the leasing, construction, or purchase of a building through another State agency or "for any other approved purpose that is necessary for acquisition of office space" (emphasis added). Thus, the key criterion for determining the permissible use of funds under this subsection is whether the use is related to the "acquisition" of office space.
The statute does not define "acquire" or "acquisition." The dictionary defines "acquire" as "to come into possession or ownership of; get as one's own" and "acquisition" as the "the act of acquiring or gaining possession." Random House Dictionary of the English Language 18 (2d ed. 1987); see also Black's Law Dictionary 24 (7th ed. 1999). There are various ways by which one may acquire or gain possession of something — e.g., construct, purchase, or lease.
Ordinarily, the acquisition of space — i.e, taking possession or ownership of it — does not include ongoing operational expenses such as utilities, maintenance, and security. For example, when an agency purchases, constructs, or refurbishes a building, payments for utility services, routine maintenance, and security are generally not part of "the act of acquiring or gaining possession", but rather obligations resulting from the fact of possession. However, some landlords may include such costs as part of a monthly lease payment and it may be difficult or burdensome for the landlord to separate out those costs. As a result, there is some ambiguity as to whether the SAEF statute permits the use of the SAEF for such costs. In these circumstances, the budget bill may illuminate the scope of the statute. See 81 Opinions of the Attorney General at 275-76. In our opinion, if the budget bill authorizes the use of the SAEF to pay utilities, maintenance, and security expenses associated with space that DLLR occupies, those expenses may be included as part of the cost of acquisition.
May the SAEF be used to purchase desks and modular furniture, computers, phone networks, and other equipment for facilities purchased with SAEF monies?
Traditionally, furniture, computers, and telecommunications equipment have generally not been part of the cost of acquiring office space. To the extent that it has now become a standard industry practice to provide certain types of furnishings or technical equipment as part of office space, those costs may be paid with SAEF monies. Otherwise, the SAEF may not be used for these purposes, except in the limited circumstances in which the SAEF functions as a revolving fund pending federal reimbursement.
D. Use of the SAEF for "Substituted Operational Costs"
Secretary Fielder notes that, over the past several years, DLLR has changed the operation of the unemployment insurance program to take advantage of new technologies. Previously, DLLR operated 26 walk-in offices throughout the State. In recent years, DLLR has reduced the number of physical offices to five regional claim centers and, at the same time, has begun accepting claims over a toll-free telephone number and over the Internet. These changes have increased telecommunications charges and reduced rent and building expenses.
May SAEF be used for telecommunications costs where those costs are incurred as a result of consolidation of offices to save occupancy costs and to take advantage of new technologies?
For the reasons set forth above, the SAEF may not be used for these purposes. The General Assembly may wish to consider amending the statute to permit the SAEF to be used for such operational expenses.
 III Conclusion
SAEF funds may be used for the various administrative purposes set forth in the SAEF statute. Neither the budget bill nor a budget amendment may expand those purposes. Among the purposes listed in the SAEF statute is the acquisition of space used for the administration of the Unemployment Insurance Law. While there is no specific provision in the SAEF statute that allows for the payment from the Fund of costs related to occupancy, such as utilities, maintenance, and security, in some circumstances these costs may be considered part of the cost of acquisition. Moneys in the SAEF may not be devoted to a use not allowed by the SAEF statute, such as operational expenses, unless the General Assembly passes a law permitting that use.
J. Joseph Curran, Jr. Attorney General
Robert N. McDonald Chief Counsel Opinions Advice
[1] Title 8 of the Labor and Employment Article, otherwise known as the Maryland Unemployment Insurance Law, is administered by the Office of Unemployment Insurance and the Office of Employment Services. See LE § 8-301 et seq.
[2] The SAEF was created in 1945. See Chapter 270, Laws of Maryland 1945.
[3] Funds may be transferred to the SAEF temporarily from the UIAF when the Secretary uses the SAEF to cover expenses for the acquisition, repair, or maintenance of office space, and those expenses will be reimbursed from federal funds. In those circumstances, the Secretary may transfer UIAF moneys to the SAEF, so long as the transfer does not exceed the amount of the federal reimbursement and equals the "fair reasonable rental value" of the land or buildings acquired or of the proportionate amount of space used. LE § 8-422(e).
[4] The Auditor also suggested that DLLR discuss with various control entities whether $4.7 million should be reimbursed to the General Fund. We understand that, after review of the circumstances of the expenditures, the control entities recommended against reimbursement of the General Fund.
[5] Prior to 1986, the funds in the SAEF were treated as "unbudgeted funds" and were spent under an agency resolution without a legislative appropriation. After a legislative audit questioned that process, an opinion by Attorney General Sachs concluded that funds in the SAEF are "moneys of the State" for purposes of the Maryland Constitution and therefore subject to budget and appropriation procedures. See Opinion No. 86-014 (March 10, 1986) (unpublished). The General Assembly also amended the statute to clarify that those procedures applied. Chapter 399, Laws of Maryland 1986, now codified at LE § 8-422(b). See Floor Report for Senate Bill 1040 (1986) (explaining that the legislation arose out of the legislative audit and was designed to ensure that SAEF funds were appropriated through the budget process).
[6] SFP §§ 7-209 and 7-217, among others, were substantially amended in the Budget Reconciliation and Financing Act of 2004. Chapter 430, § 1, Laws of Maryland 2004. The pertinent amendments became effective on June 1, 2004. Id., § 34.
[7] Shortly thereafter, the law governing the Transportation Trust Fund was amended to restrict transfers to special funds. Chapter 291, Laws of Maryland 1987, codified at Annotated Code of Maryland, Transportation Article, § 3-216(f).
[8] The 1986 opinion also reasoned that provisions in a budget bill could "qualify" existing law and cited a 1949 opinion that stated that the Legislature could repeal or amend an existing law in the budget bill. 71 Opinions of the Attorney General at 7, citing 34 Opinions of the Attorney General 105 (1949). On its face, that proposition appears inconsistent with the Court of Appeals' decision in Bayne and other opinions of this Office concerning the prohibition against legislating in the budget. See Part II A 1 of this opinion. However, we note that the 1986 and 1949 opinions both concerned "qualification" of laws concerning the budget process, such as the budget amendment procedure, that are currently codified in Title 7 of the State Finance and Procurement Article. During the first two decades of Maryland's executive budget system, those provisions were routinely enacted as part of the budget itself. See, e.g., Chapter 206, § 3, Laws of Maryland 1918 (budget amendment procedure); see also Letter of Assistant Attorney General Richard E. Israel to Senator John A. Cade (February 28, 1985). In 1939, the General Assembly codified those provisions in Article 15A, a predecessor of the State Finance and Procurement Article. Chapter 64, Laws of Maryland 1939. Thus, a distinction may be made between a budget bill provision that qualifies the type of budget procedure that has long been part of the budget bill and an attempt to alter substantive legislation that governs a particular fund or agency. Moreover, to the extent that a provision concerning budgetary procedure appears in the budget bill as submitted by the Governor, one of the major reasons for the prohibition against "legislating in the budget" — i.e., that the budget bill is not subject to a gubernatorial veto — is of less concern.
[9] The situation involved in the 1986 opinion had the further complication that the funds would be transferred from one department to another. Because the law then, as now, generally barred the use of budget amendments to transfer funds between departments, Attorney General Sachs advised that it would be necessary for the Governor to declare an emergency to invoke one of the exceptions to the prohibition on inter-departmental transfers. See SFP § 7-209(e); 71 Opinions of the Attorney General at pp. 7-8. *Page 189