600 P.2d 1202

Francisco C. ARANDA,
Plaintiff-Appellant,

v.

MISSISSIPPI CHEMICAL CORPORA-
TION, Employer and United States Fi-
delity and Guaranty Insurance Compa-
ny, Insurer, Defendants-Appellees.

No. 3686.

Court of Appeals of New Mexico.

Aug. 7, 1979.

M. Jane Shuler, M. Rosenberg, Carlsbad, for plaintiff-appellant.

B. R. Baldock, Michael T. Worley, Sanders, Bruin & Baldock, Roswell, for defendants-appellees.

## OPINION

SUTIN, Judge.

Workmen's compensation benefits were denied plaintiff and he appeals. We reverse.

The trial court made extensive findings. Reduced in length, the findings may first be partially summarized as follows:

Plaintiff, now 30 years of age with the equivalent of a high school education, plus some college level training and experience in welding, suffered a fractured ischium (a bone on which you sit) and a lumbosacral sprain. On July 2, 1976, he was crushed between a jeep and grease wagon while working underground as a mechanic on production.

From July 2, 1976 to October 12, 1976, plaintiff was paid all workmen's compensation benefits. *From October 12, 1976 to May 15, 1977, plaintiff was put to work temporarily as a welder in an underground mechanic shop and was able to perform all duties required of him.*

21. At the end of the shut-down period on or about May 15, 1977, *the Plaintiff was directed to return to his former job on production, working as a mechanic* with a crew tunneling into the ore body in the actual mining process.

22. His regular job as a mechanic on production routinely required him to work alone and in a stooped-over position, drag heavy tools, and to work with and on heavy equipment. He was also required in his regular duties to twist and turn and work from awkward positions.

23. *The Plaintiff's injury prevents him from doing the heavy lifting required in the job he was performing at the time he was injured.*

\* \* \* \* \* \*

26. *Plaintiff terminated his employment voluntarily . . . on or about May 15, 1977.* [All emphasis added.]

Plaintiff had secured employment at Southwestern Investment Company (S.I.C.) on the date that he terminated his employment and worked continuously as credit manager and wholly performed his work which was work that he was qualified to do by reason of age, education, training, general physical and mental capacity and previous work experience from May 15, 1977 to the date of the trial on April 17, 1978.

The court concluded that "Plaintiff's injury has not disabled him from employment for which he is fitted by age, education, training, general physical and mental capacity and previous work experience."

To state the findings succinctly:

(1) Plaintiff was unable to perform his work in production as a mechanic in the mine;

(2) Plaintiff was able to perform his lighter, temporary work as a welder in the shop;

(3) When *directed to return* to his former job in production, work which he was *unable* to perform, plaintiff *voluntarily* quit; and

(4) Plaintiff secured employment with S.I.C. as credit manager for which he was qualified and this work was wholly performed.

Therefore, plaintiff was not disabled.

The court relied upon *Medina v. Zia Company,* 88 N.M. 615, 544 P.2d 1180 (Ct. App.1975) which contains the two-prong test. To be entitled to workmen's compensation benefits, a workman must be totally or partially unable to perform work he was doing at *the time of injury,* and, wholly or partially unable to perform work *for which he was fitted.*

The trial court found that plaintiff was unable to perform the work he was doing at *the time of the injury.* In this appeal, we are not involved with the *Medina first test.* We are faced with *the second test.*

Under the *Medina* second test, if (1) plaintiff *voluntarily* left his work as a *welder,* work for which he was fitted, or (2) if plaintiff secured employment as a credit manager, work for which he was fitted, then plaintiff was not entitled to workmen's compensation benefits.

### A. *Plaintiff did not voluntarily leave his work as a welder.*

■ "If a claimant, through voluntary conduct *unconnected with his injury,* takes himself out of the labor market, there is no compensable disability. If an employee, after injury, resumes employment and is fired for misconduct, his impairment playing no part in the discharge, there is no compensable disability. Total disability benefits have been denied *when a partially disabled claimant has made no bona fide effort to obtain suitable work when such work is available.*" [Emphasis added.] *Vetter v. Alaska Workmen's Compensation Board,* 524 P.2d 264, 266–67 (Alaska 1974); 2 Larson's Workmen's Compensation Law, § 57.-64 (1976).

"When we say, 'He left his work voluntarily', we commonly mean, he left of his own motion; he was not discharged. It is the opposite of discharge, dismissal or lay-off by the employer or other action by the employer severing relations with his employes, to provide against which the act was mainly designed." *Department of Labor, Etc. v. Unemployment C. Bd. of R.,* 133 Pa.Super. 518, 3 A.2d 211, 213 (1938); Black's Law Dictionary at 1746 (Rev. 4th Ed. 1968). "Voluntarily" means done "of one's own free will." *Allen v. Core Target City Youth Program,* 275 Md. 69, 338 A.2d 237, 243 (1975). See, *LeMon v. Employment Security Commission,* 89 N.M. 549, 555 P.2d 372 (1976).

In *Medina,* plaintiff ·was injured and returned to work performing light duty on lawns. Later, he underwent corrective surgery. When discharged from the hospital, he left his job, went home and did not return to work. *Light duty work was available to him.* He was wholly able to perform the light work for which he was fitted *but refused to return to work.* It is obvious that Medina did not comply with the second test. The *Medina* case falls within the "capacity to work" rule. As he could return to work without any loss of earnings, he was not entitled to any such benefits. 2 Larson's Workmen's Compensation Law, § 57.66 (1976).

At this point, we leave the *Medina* case. "At the end of the shut down period on or about May 15, 1977, *the plaintiff was directed to return to his former job on production,* working as a mechanic with a crew tunneling into the ore body in the actual mining process." In response to a question of why he sought other work, plaintiff said:

> Because I knew I couldn't work in the panel, I wouldn't make it, I just couldn't get around underground walking and stooping over and the toolboxes, like I said, you have to load them and carry them to the faces to work, and I knew I wasn't going to be able to do it, I was just barely making it.

Plaintiff did not leave his job, go home and fail to return to work as Medina did. Plaintiff left his light duty job as a welder, a temporary job, because he was directed to return to his former job.

Defendants rely upon the following testimony of plaintiff:

Q. The work they had you do, Mr. Aranda, you were capable of doing it?

A. Yes, sir.

Q. And, that you quit, they did not discharge you?

A. That's right.

Q. And that was in May of 1977?

A. Yes, sir.

■ This testimony proves that plaintiff quit. It does not establish that he voluntarily left his employment. His disability or inability to perform his former job on production induced or caused plaintiff to quit.

His change of work was not of his own making. Plaintiff advised his employer that he was terminating his employment because he wanted an easier job "for less lifting and all of that." He wanted to work, not to play the part of Rip Van Winkle, a characteristic that deserves commendation, not punishment.

We hold that plaintiff did not voluntarily leave his employment. The trial court erred in holding contrariwise.

B. *Plaintiff was partially disabled in his full-time employment with S.I.C.*

Plaintiff went to work as a credit manager for S.I.C. on May 15, 1977. Some nine months prior thereto, the ischium had completely healed. Plaintiff was then fitted with a corset, instructed in calisthenics and warned against sitting all of the time as long as he had back sprain.

At S.I.C., plaintiff's work pace was slow. He handled payments and arranged loans. Eighty percent of his time or more was spent in sitting at a phone and at his desk. He stopped wearing the corset because he did not have to do any heavy lifting such as that during the repossession of furniture. This work had not been assigned to him. He stopped doing calisthenics because of the pain it caused in his back. He does have pain sitting down, but he did the best he could to keep his job in order to support his family. His employer knew of his physical condition. He worked continuously every working day and received a wage increase.

On March 27, 1978, *21 days before trial*, an orthopedic physician who had treated Aranda, examined him for the last time and presented a written report. His examination and cross-examination at trial consisted in good part of quotations from his report. When asked his opinion of plaintiff's condition as of March 27, 1978, he stated:

Well, my last summary paragraph of my report points out that *he has a chronic lumbosacral sprain*, which I recognized at the time of his discharge from my care. *And I recommended to him at the time of his discharge, that he wear the corset and*

*that he continue his calisthenics. . . . I felt that the discomfort that he was experiencing, was to a varying degree persisting from six to nine months even in the face of the support and calisthenics. Now, it is my informal understanding, that the support was discarded and the calisthenics were not engaged in, and the symptoms have correspondingly continued.* I think this is an unfortunate phenomenon if he would choose to return to formally recommended routine. [Emphasis added.]

In the conclusion of his report he stated that plaintiff "is substantially disabled from heavy activities and *has perhaps five to ten percent partial disability in sedentary activities.*" [Emphasis added.] When asked:

Q. *Is that your opinion, sir?*

A. *Yes, sir.* [Emphasis added.]

In his report he also stated:

In fact, after quitting his job as a underground mechanic in May, he took his present employment which is one-hundred percent sitting job working as a collecting agent for a finance company. Principally involved in making telephone calls to delinquent accounts.

This fact is why he cautioned plaintiff about sitting a hundred percent of the time. In the concluding paragraph, the physician stated:

*Obviously, the patient regarded his symptoms of his lumbosacral sprain as serious enough to warrant quitting a highly lucrative job for one much less rewarding* and it is a shame that he did not pursue some attempt to get recurrent medical management from me or others *before he terminated his employment. Certainly the sitting job he now has will give him nothing but increasing grief in years to come, unless a program of rehabilitation as outlined is followed.* [Emphasis added.]

Yet, in his physical condition, the physician said, plaintiff was able to perform his work as a credit manager and the physician did not give plaintiff a temporary, partial disability.

The evidence is undisputed that plaintiff was partially disabled. Even if plaintiff had continued with use of his corset and calisthenics exercise, adequately explained by plaintiff, the physician felt that plaintiff's "discomfort" would persist from six to nine months after March 27, 1978.

In *Medina v. Wicked Wick Candle Co.*, 91 N.M. 522, 577 P.2d 420 (Ct.App.1977), plaintiff, disabled as a waitress, retrained herself to become a clerk typist for the State, engaged in full-time employment. She was held to be partially disabled, not totally disabled. In the course of the opinion, the court said:

> . . . "Training" is included in the second test of total disability. *The reason for including the element of "training" is to encourage a workman to seek other employment and to work despite disability that results from an accidental injury.* The Workmen's Compensation Act does not condone the conduct of those employees who desire to sleep as Rip Van Winkle did in the fable of the 19th century. *In addition to compensation received for gainful employment, plaintiff is also entitled to compensation benefits for partial disability.* [Emphasis added.] [91 N.M. at 525–26, 577 P.2d at 423–424.]

To set the guidelines for proving total or partial disability, *see, Marez v. Kerr-McGee Nuclear Corporation*, 93 N.M. 9, 595 P.2d 1204 (Ct.App.1978), Sutin, J., specially concurring. Unfortunately, publication of this opinion was delayed. A misconception exists on the meaning of the phrase in the definition of disability which uses the language: "wholly unable to perform ANY work," or "unable to some percentage extent to perform ANY work."

"ANY work" for an engineer, plant foreman, department head or mine employee who labors in production does not mean such sedentary work or activity such as that of a janitor, filling station attendant, raker of leaves, one who can sell pencils or 25 other sedentary jobs. "ANY work" means a workman's ordinary employment, or such other employment, if any, approximating the same livelihood the workman might be expected to follow in view of his circumstances and capabilities. To conclude that an electrical engineer is partially disabled because he is capable of raking leaves or performing janitorial services destroys the spirit of the Workmen's Compensation Act. He has no other skills or training to draw upon. Total disability does not mean that a workman must be a helpless invalid.

■ In addition, "ANY work" must be available. Total disability must not be an inducement to malingering. A workman must make reasonable efforts to obtain work with the employer within work capabilities. If not available, such reasonable efforts must be made elsewhere. The employer should also make reasonable efforts to retain the employee in such jobs that are comparable or similar to the workman's skills and training. If not available, the employer should make reasonable efforts to assist the workman in obtaining comparable available employment elsewhere.

■ The primary purpose of the Workmen's Compensation Act is to keep an injured workman and his family at least minimally secure financially. Public policy demands it. *See, Lane v. Levi Strauss & Co.*, 92 N.M. 504, 590 P.2d 652 (Ct.App.1979). The trial court found that plaintiff's earnings at S.I.C. were approximately 60% of his earnings at defendants' mine.

In *Marez*, Marez was employed as a first class operator in the boiler room of the acid plant of his employer. After his injury, he was transferred from the acid plant to the rubber plant. This work required bending, lifting and squatting. His back injury was aggravated, resulting in much pain and limping. A laminectomy was performed. His pain returned. He continued to work, but he was compelled to quit because he could not perform his duties. *Marez sought to do lighter work along with his pain and disability but nothing was available.* Even though Marez could do lighter work, the court held Marez totally disabled. The fact that an expert testified that the workman could then perform 26 sedentary jobs did not reduce total disability to partial disability.

In the instant case, plaintiff was not totally disabled because he searched for and obtained lighter work.

■ We hold that plaintiff was partially disabled from May 15, 1977 to the date of judgment in the trial court. Plaintiff is entitled to compensation benefits as provided by law for partial disability, and to a reasonable attorney fee for services rendered in the trial, taking into consideration the services rendered in this appeal.

This cause is reversed and remanded to the trial court to vacate its judgment, determine the percentage of plaintiff's partial disability at the time of trial, and enter judgment based thereon.

IT IS SO ORDERED.

LOPEZ, J., concurs.

HERNANDEZ, J., dissenting.

HERNANDEZ, Judge (dissenting).

I respectfully dissent.

Section 52–1–25 of our Workmen's Compensation Act provides:

"As used in the Workmen's Compensation Act, 'partial disability' means a condition whereby a workman, by reason of injury arising out of and in the course of his employment, is unable to some percentage-extent to perform the usual tasks in the work he was performing at the time of his injury *and is unable to some percentage-extent to perform any work for which he is fitted by age, education, training, general physical and mental capacity and previous work experience."* [Emphasis added.]

The trial court made the following findings of fact, among others:

29. Plaintiff has worked continuously as Credit Manager at SIC since May 15, 1977.

30. Plaintiff has wholly performed the work as Credit Manager at SIC which was work he was qualified to do by reason of age, education, training, general physical and mental capacity, and previous work experience at SIC from May 15, 1977, to the date of trial on April 17, 1978.

31. Plaintiff is able to perform the work available to him at SIC as Credit Manager, based upon his age, education, training, general physical and mental capacity, and previous work experience.

The trial court made the following conclusion of law, among others:

3. The Plaintiff's injury has not disabled him from employment for which he is fitted by age, education, training, general physical and mental capacity and previous work experience.

Dr. A. E. Luckett testified in part as follows:

"Q. Does Mr. Aranda's condition, as you found him on March 27, 1978, interfere with his capacity to work as a SIC Credit Manager?

"A. No.

"Q. You are not giving this man a temporary, partial disability from his capacity to work at SIC at this time, are you?

"A. No, sir."

This testimony, in my opinion, sustains the trial court's findings and conclusion cited above.

I would affirm the trial court's judgment.