IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

Opinion Number: _____

Filing Date: May 30, 2013

Docket No.  32,844

JESUS GONZALEZ,

     Worker-Petitioner,

v.

PERFORMANCE PAINTING, INC., and
BUILDERS TRUST OF NEW MEXICO,

     Employer-Insurer-Respondents.

ORIGINAL PROCEEDING ON CERTIORARI
Terry S. Kramer, Workers' Compensation Judge

James Rawley
Albuquerque, NM

for Petitioner

Miller Stratvert, P.A.
Nathan A. Cobb
Erica R. Neff
Thomas R. Mack
Albuquerque, NM

for Respondents

## OPINION

**BOSSON, Justice.**

{1}     Undocumented workers injured on the job present a special challenge under the Workers Compensation Act.  All workers are encouraged to return to work when medically feasible, yet federal law may preclude some employers from extending rehire offers to undocumented workers once they learn of their status.  Federal law also requires employers to hire in good faith and demand documentation of prospective employees showing their

1

lawful status. Because an offer to rehire must be a legitimate offer, we hold that employers who cannot demonstrate such good faith compliance with federal law in the hiring process cannot use their workers' undocumented status as a defense to continue payment of modifier benefits under the Workers' Compensation Act. The Court of Appeals having decided to the contrary, we reverse.

## BACKGROUND

{2}    Jesus Gonzalez (Worker) is an undocumented immigrant, coming to this country from Mexico for the first time in 2003 and again in 2005. In early February of 2006, he was hired by Performance Painting, Inc. (Employer) as a painter's helper. By all accounts, Worker was a good employee and worked without incident until August 31, 2006. On that date, Worker fell off a ladder, injuring his shoulder. As a result of the injury, Worker was temporarily totally disabled and unable to work. The injury required multiple surgeries and months of physical therapy.

{3}    Worker reached maximum medical improvement on August 30, 2007. He was assigned a 3 percent permanent base impairment rating based upon his shoulder injury and its effect upon his whole body. He was also permanently restricted in the type of work he could perform, including no lifting above his head, all lifting limited to ten pounds occasionally or up to five pounds frequently, and no climbing ladders or extended bending.

{4}    Worker temporarily returned to work with Employer in January of 2008. By early February, however, Worker stopped going to work, due at least in part to Employer's inability to accommodate his injury-related work restrictions. Worker also claims that he stopped working because of a slowdown in the amount of work available. Worker then filed a complaint for workers' compensation on February 18, 2008.

{5}    Sometime in late April, Worker received a letter through his attorney offering Worker a chance to return to work for Employer. The letter was written by and on the letterhead of legal counsel for Employer's Insurer. The employment offer was for modified duty, taking into account Worker's injury-related restrictions. As will be discussed later in more detail, an injured worker with a permanent partial disability is entitled to additional modifier benefits based upon the worker's age, education, and physical capacity but only until the worker returns to work at the same or better wage. NMSA 1978, § 52-1-26(C) & (D) (1990). Hence, Employer's offer among other things was an attempt to limit its continuing obligation to pay modifier benefits. The offer required Worker to fill out a new application which would explicitly "include verification of his eligibility for employment." Worker received at least three such letters.

{6}    On June 20, 2008, Worker appeared in Employer's office to fill out the necessary paperwork to return to work. Worker began filling out the application packet and was asked to produce a social security card, which Employer had not requested previously. Unable to complete the verification, Worker left the office and never returned.

2

**{7}** In early August of 2008, Worker began working elsewhere and continued to work there through trial. For the week ending on August 16, 2008, for the first time since his injury, Worker made a wage in excess of his pre-injury wage.

**{8}** During the proceedings before the Workers' Compensation Administration, Employer argued that Worker's failure to prove eligibility to work on June 20, 2008, constituted an unreasonable refusal to return to work, thereby limiting Worker's benefits to the base impairment rating without any modifier benefits. The Workers' Compensation Judge (WCJ) agreed. The WCJ concluded that Worker was entitled to partial disability benefits commencing August 30, 2007, Worker's date of maximum medical improvement, at the rate of 51 percent, (3 percent permanent physical impairment plus 48 percent modifier points), but only until June 20, 2008. After that date, Worker was only entitled to his 3 percent permanent impairment rating because "Worker could not accept a bona fide return to work offer made by Employer" due to his immigration status, and therefore "Worker unreasonably refused a return-to-work offer from Employer." Worker appealed and the Court of Appeals affirmed but for slightly different reasons which we will discuss in turn. *See Gonzalez v. Performance Painting, Inc.,* 2011-NMCA-025, ¶ 1, 150 N.M. 306, 258 P.3d 1098. We granted certiorari to review an important point of law that potentially affects numerous undocumented workers across this state.

## DISCUSSION

### Workers' Compensation Act

**{9}** The purpose of the Workers' Compensation Act (WCA) is to provide "quick and efficient delivery of indemnity and medical benefits to injured and disabled workers at a reasonable cost to the employers who are subject to [its] provisions." NMSA 1978, § 52-5-1 (1990). The WCA is a delicate balance between the rights and interests of the worker and the employer. *See id.* Thus, "any judicial analysis under the [WCA] must balance equally the interests of the worker and the employer without showing bias or favoritism toward either." *Salazar v. Torres*, 2007-NMSC-019, ¶ 10, 141 N.M. 559, 158 P.3d 449.

**{10}** Both parties agree that the WCA generally applies to undocumented workers, at least since legislative action taken to that effect in 1984. *See Performance Painting*, 2011-NMCA-025, ¶ 15. (noting the Legislature's 1984 deletion from the WCA of the denial of benefits for a worker's nonresident alien dependents). Accordingly, the benefits awarded prior to Worker reaching maximum medical improvement are not at issue. Neither does Employer dispute Worker's entitlement, despite his undocumented status, to the 3 percent permanent partial disability benefits based on his physical impairment rating. The dispute in this case focuses instead on whether Worker's status as an undocumented immigrant prevents him from receiving permanent partial disability *modifier* benefits which were calculated at 48 percent of his pre-injury wage. We proceed to that question, and begin with the WCA itself.

3

**Permanent Partial Disability**

**{11}**  As previously stated, once an injured worker reaches maximum medical improvement, the worker may be eligible for permanent partial disability benefits if the worker has suffered a "permanent impairment." NMSA 1978, § 52-1-26(B) (1990). The amount of benefits are "determined by calculating the worker's impairment as modified by his age, education and physical capacity." Section 52-1-26(C). The age and education modifiers are added together and then multiplied by the physical capacity modifier. NMSA 1978, § 52-1-26.1(B) (1990). This number is then added to the base impairment rating to determine the total award. NMSA 1978, § 52-1-26.1 (C) (1990). This case illustrates the significance of both benefits, where Worker's base impairment was only 3 percent, but his modifier benefits added another 48 percent.

**{12}**  As noted earlier modifier benefits are not permanent. Section 52-1-26(D) states that "[i]f, on or after the date of maximum medical improvement, an injured worker returns to work at a wage equal to or greater than the worker's pre-injury wage, the worker's permanent partial disability rating shall be equal to his impairment and shall not be subject to modifications." In other words, the WCA provides the employer with an incentive to re-employ the injured worker, and the worker has an incentive to accept a reasonable return-to-work offer, both of which relieve the worker's compensation system.

**{13}**  It could be argued that the plain meaning of the statute is clear, in that an injured worker is entitled to modifier benefits until the worker actually "returns to work," which would allow the worker to decide whether to work at all. Under this theory, an injured worker could refuse even a reasonable and legitimate return-to-work offer and continue collecting modifier benefits, even if the worker simply did not feel like working.

**{14}**  But, this Court has cautioned in the past against reading the WCA too literally. As this Court stated in *Chavez v. Mountain States Constructors*, "New Mexico appellate courts have previously recognized that the provisions of the [WCA] are imprecise. . . . This serves as a warning that the plain language rule may not be the best approach to interpreting this statute." 1996-NMSC-070, ¶ 25, 122 N.M. 579, 929 P.2d 971. Therefore, a literal interpretation of the WCA is not always appropriate.

**{15}**  Such an interpretation would upset the delicate balance between workers and employer interests present in the WCA. It would give sole control over how long a worker collects modifier benefits to the worker. As this case demonstrates, with Worker's base impairment rating of 3 percent and modifier benefits of 48 percent, modifier benefits can be a significant portion of the total amount of permanent partial disability benefits. Allowing a worker to refuse a reasonable and legitimate return-to-work offer in favor of continuing to collect modifier benefits, is simply not the scheme the Legislature intended.

**{16}**  Finally, this interpretation would ignore the following stated purpose of permanent partial disability benefits:

4

As a guide to the interpretation and application of this section, the policy and intent of this legislature is declared to be that every person who suffers a compensable injury with resulting permanent partial disability should be provided with the *opportunity* to return to gainful employment as soon as possible with *minimal* dependence on compensation awards.

Section 52-1-26(A) (emphasis added). The stated purpose is to provide an *opportunity* to return-to-work. A reasonable and legitimate return to work offer would fulfill this purpose, even if the offer is refused. But, if a worker were allowed to refuse a reasonable job offer and continue collecting modifier benefits, the worker would be *more* dependent on the compensation award. Thus, a scheme in which a worker could refuse an employment opportunity in favor of receiving more benefits would directly contradict the Legislature's stated purpose.

{17}    Accordingly, our Court of Appeals has correctly interpreted this section of the WCA to mean that if an injured worker refuses a reasonable return-to-work offer, the worker becomes ineligible for modifier benefits. In *Jeffrey v. Hays Plumbing & Heating*, the injured worker refused an employer's return-to-work offer in favor of starting his own business. 118 N.M. 60, 61, 878 P.2d 1009, 1010 (Ct. App. 1994). The Court of Appeals held that rewarding voluntary unemployment or underemployment—by allowing a worker to refuse a reasonable return-to-work offer but continue collecting modifier benefits—"would be contrary to the [WCA]." *Id.* at 64, 878 P.2d at 1013. The Court stated that such benefits should be "denied if a claimant, through voluntary conduct unconnected with his injury, takes himself out of the labor market."[1] *Id.* (internal quotation marks and citation omitted).

{18}    The holding in *Jeffrey* was later applied in *Connick v. County of Bernalillo*, 1998-

---

[1] If Worker had been denied *all* benefits, we would readily agree with the sentiments expressed in the Special Concurrences that undocumented workers are entitled to impairment benefits. The law is clear, as in this case, that impairment benefits–based on physical injury–cannot be denied, and were not denied in this case, due to undocumented status. But since 1991, the Legislature has separated permanent partial disability benefits into two categories, impairment and modifier, and this opinion only concerns the latter. Modifier benefits are based in part on "the difference between the physical capacity necessary to perform the worker's usual and customary work and the worker's residual capacity." Section 52-1-26.4(B). The effect of physical impairment upon ability to work remains, therefore, part of the calculus that the Legislature—not the judiciary—has created to assess overall benefits. *See* Section 52-1-26(A) (declaring legislative policy that injured workers be provided with the opportunity to return to work). It is this *continuing* reference in the Act itself to physical capacity to work that gave rise to *Jeffrey* and directs the result we reach in this case. As suggested in the Special Concurrences, we would all welcome additional clarity from our legislative branch. Until that time, however, we have no choice but to make principled distinctions that reconcile statutory language and purpose.

5

NMCA-060, 125 N.M. 119, 957 P.2d 1153, again to deny modifier benefits. In *Connick*, the injured worker was later sent to prison for second-degree murder, but still claimed he was entitled to continuing modifier benefits. *Id.* ¶¶ 2-3. The *Connick* Court affirmed that "after *Jeffrey*, disability benefits (other than impairment) may be denied, reduced, or suspended if a claimant voluntarily . . . takes himself out of the job market." *Id.* ¶ 8. The Court reasoned that "[a]lthough there is no evidence that a job offer was made in this case, it would have been futile to do so under the circumstances; Claimant's incarceration effectively removed him from the labor market." *Id.* ¶ 9.

**{19}** In this case, the WCJ denied Worker modifier benefits, presumably relying on *Jeffrey* and *Connick*. Specifically, the WCJ concluded that "Worker could not accept a bona fide return-to-work offer made by Employer due to Worker's status as an illegal undocumented worker." As a result, "Worker unreasonably refused a return-to-work offer from Employer."

**{20}** The Court of Appeals also denied Worker modifier benefits, although for different reasons. *Performance Painting*, 2011-NMCA-025, ¶ 1. The Court of Appeals held that undocumented workers are *categorically* ineligible for modifier benefits—in every case—because under federal law they are ineligible to work. *Id.* ¶ 33. The Court reasoned that "[w]here, as here, an employer is legally forbidden to rehire a worker because the worker is undocumented, we doubt that the Legislature intended Section 52-1-26 to nevertheless apply to allow the worker to receive modifier benefits." *Id.* ¶ 29.

**{21}** To a limited degree, the Court of Appeals' conclusion has certain merit based on the effect of federal law, at least in some instances, on an employer's efforts to rehire an undocumented worker. But that is not the end of our analysis, nor do we believe it captures all of what our Legislature reasonably intended in a situation like this.

**{22}** Simply put, the Court of Appeals' conclusion in this case turns a blind eye to the reality of undocumented workers all across this state and to the facts of this case in particular. The reasoning, stated simply, is that because Worker is not *allowed* to work, then he cannot work, and that if he cannot work, then he does not work, either for Employer or someone else. Because he cannot work, modifier benefits—based in part on his ability to return to work—cannot apply.

**{23}** Yet Worker does work. He has held numerous jobs since entering the United States, including his employment by Performance Painting. At the time of trial, Worker had already found a new job and was working full time for a different employer at a better wage. Modifier benefits would have terminated at that point even without a return-to-work offer by Employer. Whether lawful or not, men and women like Worker in this case often do find employment somewhere, and when they do, modifier benefits can be terminated in the manner prescribed by the WCA.

**{24}** In addition, refusing modifier benefits to undocumented workers across the board would give rise to other problems. It would create a perverse incentive for employers to *hire*

undocumented workers over other workers, especially in high-risk jobs that often result in workers' compensation claims. An employer could hire undocumented workers, knowing that in the event of injury the employer would likely pay a much lower amount in workers' compensation benefits due to ineligibility for modifier benefits. This would again upset the balance the Legislature created in the WCA—this time tipping it in favor of the employer as opposed to the worker. Other courts have noted this problem. *See Rivera v. NIBCO, Inc.*, 364 F.3d 1057, 1072 (9th Cir. 2004). ("[E]mployers have a perverse incentive to ignore immigration laws at the time of hiring but insist upon their enforcement when their employees complain.").

**{25}** There is a better approach, one more consistent with legislative intent. The essence of the Court of Appeals' holding seems based more on the potential unfairness to a particular employer, one who normally would offer re-employment in order to save money on modifier benefits (or avoid higher insurance premiums), but who cannot legally do so once the employer learns of the illegal status of its former worker. We agree that fairness should prevail on behalf of such an employer, so long as the employer can show he did the best he could under the circumstances to avoid the predicament. In other situations, however, where the employer is culpable for improperly hiring the worker in the first place, the worker should not shoulder all the responsibility. That would upset the delicate balance between worker and employer interests our Legislature has required. *See* Section 52-5-1 (stating that the WCA is not to be construed "in favor of the claimant or employee on the one hand, nor are the rights and interests of the employer to be favored over those of the employee on the other hand."); *Salazar*, 2007-NMSC-019, ¶ 10; *Delgado v. Phelps Dodge Chino, Inc.*, 2001-NMSC-034, ¶ 12, 131 NM 272, 34 P.3d 1148.

**{26}** The Court of Appeals correctly noted that

> [w]here the pre-injury employer knew or should have known of the injured worker's undocumented status, the employer cannot make a bona fide rehire offer. An offer as contemplated in Section 52-1-26 by a pre-injury employer to rehire an injured, undocumented worker would in that instance be illusory, if not a ruse.

*Performance Painting,* 2011-NMCA-025, ¶ 29. We agree with this statement of the law. Whether an employer knew or should have known, before the worker was injured, that a worker was undocumented determines whether an employer's rehire offer was legitimate and should be the focus of our inquiry and the basis of determining whether the injured worker is entitled to modifier benefits. Such a focus maintains the appropriate neutrality between employers and workers and in doing so stays true to the original intent of the Legislature.

**The Immigration Reform and Control Act**

**{27}** As noted in the Court of Appeals opinion, *see id.* ¶ 17, Congress passed the Immigration Reform and Control Act (IRCA) in 1986. Pub. L. No. 99-603, 100 Stat. 3359

7

(1986) (codified as amended in scattered sections of 8 U.S.C.). IRCA seeks to discourage illegal immigration by making it unlawful to hire undocumented workers. *See* 8 U.S.C. § 1324a(a)(1)(A) (2006). As stated by the United States Supreme Court, "IRCA forcefully made combating the employment of illegal aliens central to [t]he policy of immigration law." *Hoffman Plastic Compounds, Inc. v. N.L.R.B.*, 535 U.S. 137, 147 (2002) (internal quotation marks and citation omitted).

**{28}** Thus, under IRCA, employers "have an affirmative duty to determine that their employees are authorized." *New El Rey Sausage Co., Inc. v. U.S. I.N.S.*, 925 F.2d 1153, 1158 (9th Cir. 1991). As the Court of Appeals noted, this is accomplished by imposing a legal duty on employers that includes "examining specified documents that establish the person's identity and eligibility for employment in the United States and completing Form I-9, which evidences that examination." *Performance Painting*, 2011-NMCA-025, ¶ 18 (quoting *Coque v. Wildflower Estates Developers, Inc.*, 58 A.D.3d 44, 49 (2008)). If the employer fails to properly inspect the documents, then the employer "has failed to adequately ensure that the alien is authorized." *New El Rey Sausage Co.*, 925 F.2d at 1158. Accordingly, penalties can be assessed for the failure to follow the proper procedure in filling out an I-9 Form. 8 U.S.C. § 1324a (e)(5) (as amended through 2005). While a completed I-9 Form need not actually be submitted for verification in New Mexico, all employers are required to keep the completed forms for a minimum of three years. 8 U.S.C. § 1324a(b)(3)(B)(i) & (ii).

**{29}** Based on these federal requirements, an employer who does not properly fill out an I-9 Form and demand necessary documentation, as is required, either should have known or is deemed to have known that the worker would likely be undocumented and ineligible for rehire in the event of injury. The I-9 Form is how an employer gains knowledge of a newly-hired worker's eligibility for employment. If an employer fails to fill out the form and demand proof of documentation, either purposefully or negligently, then the employer has failed to perform his affirmative duty to determine the worker's eligibility for employment. Based on this failure, knowledge of the worker's immigration status can be imputed to the employer for the purposes of Workers' Compensation benefits. An offer to rehire would then be, in the words of the Court of Appeals, "illusory, if not a ruse." And under these circumstances the employer should fairly bear the responsibility for that predicament, one of his own creation. The employer would fairly owe modifier benefits.

**{30}** On the other hand, there are other times when an employer has properly filled out the I-9 form, but an undocumented worker presents false documents. In this situation, IRCA provides for an affirmative defense to a violation, if the employer has complied in good faith with IRCA's requirements. 8 U.S.C. § 1324a(a)(3). We see no reason why such a defense should not apply to cases involving modifier benefits. Accordingly, if a worker presents false documents to an employer during the initial hiring and the employer does not otherwise know or should know of the worker's undocumented status, then the worker should not be allowed to benefit from such deception by collecting modifier benefits. In any case, an employer can protect itself simply by following the law.

8

**{31}** In our view, this resolution strikes an appropriate balance between employers and workers, as the Legislature intended in the WCA, regarding undocumented workers and modifier benefits. If an otherwise nonculpable employer has complied with the federal requirements of IRCA, and properly fills out an I-9 form including necessary documentation, the employer cannot be forced to pay modifier benefits to an undocumented worker. This is true even if the employer has, post-injury, learned of the worker's undocumented status. An otherwise nonculpable employer can establish a good faith defense. This approach favors neither the worker or the employer. Whichever party is more culpable, by either failing to perform an affirmative duty or presenting false documents to obtain employment, suffers the most; he is not permitted to benefit from that party's own wrongdoing.

**Employer Did Not Properly Confirm Worker's Eligibility to Work**

**{32}** We now turn to the facts of this case to evaluate Employer's return-to-work offer. Despite both Worker and Employer requesting findings of fact on whether Employer should have known that Worker was undocumented, the WCJ failed to rule on this issue. In his defense, the WCJ admitted that the law regarding undocumented workers and modifier benefits was unclear, and he hoped to get an appellate court ruling on the matter. The Court of Appeals stated that "[i]n the present case, Employer provided no evidence that it used the required I-9 forms, much less used any in connection with Worker's hire." *Performance Painting,* 2011-NMCA-025, ¶ 19. Following our review of the whole record, *see Rodriguez v. Permian Drilling Corp.*, 2011-NMSC-032, ¶ 7, 150 N.M. 164, 258 P.3d 443, we agree. The evidence demonstrates convincingly that Employer did not follow the proper procedures when Worker was initially hired.

**{33}** Employer testified at trial about the hiring process at Performance Painting. Specifically, Employer testified that the office manager would have been responsible for Worker's paperwork when he was initially hired. In her deposition, the office manager testified that she did not personally hand out any I-9 forms. She also testified that she never received any training regarding how to document immigration status and never inquired about the immigration status of newly-hired workers. There was much discussion and testimony before the WCJ about how Worker provided a false social security *number*, but never any indication that he actually presented a social security *card*. In fact, when asked why Worker's employment file contained no copy of such identification, according to Employer's usual practice, Employer stated by assumption that the office manager "was using the New Hires form . . . and using the state to verify."

**{34}** The record contains two different I-9 forms for Worker, neither of which are properly completed. The first is dated June 20, 2008, and appears to be the I-9 form that Worker began but never completed when attempting to accept Employer's return-to-work offer. The other I-9 form is not dated, making it impossible to determine when it was filled out. Each form, however, is only partially completed, with the section Employer is supposed to complete after the inspection of the appropriate documents left blank on each. There is no other evidence or testimony in the record regarding whether an I-9 Form for Worker was

properly completed near the time of his initial hiring.

**{35}** Thus, it is clear to us that Employer failed to follow appropriate hiring procedures, as required by federal law, and failed to properly fill out an I-9 form and keep it on file for the requisite time period. Accordingly, we hold that Employer should have known that Worker was undocumented, and any return-to-work offer made by Employer was illusory. Therefore, Worker is entitled to modifier benefits.

**{36}** Employer argued at length before the WCJ that because he sent the appropriate documentation to New Mexico New Hires and never received word of any problems, he could not have known that Worker was undocumented. The Court of Appeals indicated that "[n]othing in the record indicates what the function of this agency is, including what, if anything, the agency does with a person's social security number." *Performance Painting*, 2011-NMCA-025, ¶ 3 n. 1. A cursory examination of the New Mexico New Hire's website and the law that created it instantly reveals the fallacy of Employer's argument. NMSA 1978, Sections 50-13-1 to -4 (1997), established the New Mexico New Hires database which requires employers to submit certain information about each worker they hire. According to the statute, "[t]he state directory of new hires shall use the information received to locate individuals for purposes of establishing paternity and establishing, modifying and enforcing child support obligations . . . ." Section 50-13-3 (B). The database's website also espouses a similar purpose. New Mexico New Hires Directory, *available at* http://newhire-reporting.com/NM-newhire/FAQ.aspx#wdwn. Neither the statute nor the website ever suggest that the database performs employment eligibility verification, and the database should not be relied upon as such. The reason that Employer never received any word from New Mexico New Hires that there were any problems with his newly hired workers is because they did not owe child support or have any paternity issues, not because they were all eligible to work in the United States.

**Worker's Entitlement to Modifier Benefits Ceased Upon Returning to Work at His Pre-Injury Wage.**

**{37}** Worker also argues that he continues to be eligible for modifier benefits even though he has returned to work at a wage equal to or greater than his pre-injury wage, because he has not returned to work for his pre-injury employer. By analogy, Worker relies on *Grubelnik v. Four-Four, Inc.*, 2001-NMCA-056, 130 N.M. 633, 29 P.3d 533, a case involving a return-to-work provision for temporary total disability as opposed to permanent partial disability, for this proposition.

**{38}** In *Grubelnik*, the Court of Appeals determined that a worker remained entitled to full temporary total disability after returning to work with a different employer. 2001-NMCA-056, ¶ 1. NMSA 1978, Section 52-1-25.1(B) (1990) (amended 2005) states that "[i]f, prior to the date of maximum medical improvement, an injured worker's health care provider releases the worker to return to work and the employer offers work at the worker's pre-injury wage, worker is not entitled to temporary total disability benefits." The worker

10

in *Grubelnik* did obtain a release to return to work but began working for a different employer, as he knew that his pre-injury employer could not accommodate his restrictions. *Grubelnik*, 2001-NMCA-056, ¶¶ 4-5.  The Court of Appeals held that the term "employer" in the return-to-work provision of Section 52-1-25.1(B) specifically referred to the pre-injury employer. *Id.* ¶ 21.  As a result, the worker could continue collecting full TTD benefits. *Id.* ¶ 26.

**{39}** This holding, however, was superceded by the Legislature in 2005, a fact not mentioned in the briefing by either side.  The current version of the statute reads as follows:

> B.  If, prior to the date of maximum medical improvement, an injured worker's health care provider releases the worker to return to work, the worker is not entitled to temporary total disability if:
>
> > (1) the employer offers work at the worker's preinjury wage; or
>
> > (2) the worker accepts employment with *another* employer at the worker's preinjury wage.

Section 52-1-25.1(B) (2005) (emphasis added).  While there is no specific mention of *Grubelnik*, in the amended statute, the expression of legislative policy on this issue is clear. A return-to-work provision is no longer contingent on returning to work for the pre-injury employer.  Although the case before us involves permanent partial disability as opposed to temporary total disability in *Grubelnik*, we see no reason, and Worker has not offered one, that the legislative policy was only intended to be applied to temporary total disability. Thus, Worker is not entitled to modifier benefits from the time he began earning an amount equal to or greater than his pre-injury wage with a new employer.  According to the WCJ, this occurred beginning with the week ending August 16, 2008, **[RP 142, FOF 51]** and that finding was not challenged on appeal, *see Johnston v. Sunwest Bank of Grant Cnty.*, 116 N.M. 422, 423-24, 863 P.2d 1043, 1044-45 (1993) ("Unchallenged findings of the trial court are binding on appeal.").  Therefore, Worker is ineligible for modifier benefits from that date on.  To be clear, *Grubelnik* is hereby overruled.

**CONCLUSION**

**{40}** For these reasons, we hereby reverse the Court of Appeals.

**{41}** **IT IS SO ORDERED.**

_____
**RICHARD C. BOSSON, Justice**

**WE CONCUR:**

**PETRA JIMENEZ MAES, Chief Justice**

**BARBARA J. VIGIL, Justice**

**EDWARD L. CHÁVEZ, Justice (specially concurring).**

**CHARLES W. DANIELS, Justice (specially concurring).**

**CHÁVEZ, Justice, specially concurring.**

**{42}** I concur with the opinion authored by Justice Bosson because it strikes a reasonable balance between the New Mexico Legislature's unquestionable policy decision that undocumented workers are to receive workers' compensation benefits consistent with the federal requirements under the Immigration Reform and Control Act of 1986, Pub. L. No. 99-603, 100 Stat. 3359 (1986) (codified as amended in scattered sections of 8 U.S.C.). Nobody questions or challenges the Legislature's policy decision, and for good reason. The reality is that undocumented workers are part of the history of New Mexico, having contributed the fruits of their labor to improve our economy and fill a void in the labor market that obviously exists both in New Mexico and throughout the United States. *See generally* David Becerra et al., *Fear vs. Facts: Examining the Economic Impact of Undocumented Immigrants in the U.S.*, 39 J. Soc. & Soc. Welfare 111, 123-24 (Issue 4, Dec. 2012). Indeed, the undocumented worker generally works for the lowest wages in the toughest jobs. *See* Lori A. Nessel, *Undocumented Immigrants in the Workplace: The Fallacy of Labor Protection and the Need for Reform*, 36 Harv. C.R.-C.L. L. Rev. 345, 347 (2001) ("Undocumented workers by definition occupy a precarious position in U.S. society: their very presence at the workplace is at the same time unlawful and necessary to perform the most difficult work at the lowest wages.").

**{43}** It has not been unusual for the United States to historically have had treaties with other countries under which undocumented workers and their dependents are guaranteed the same rights and privileges as nationals (citizen workers). 2 Arthur Larson, *Workmen's Compensation Law* § 63.52 (1994). The humanitarian policy of the Legislature to allow workers' compensation benefits for the undocumented worker is really no different than these treaties.

**{44}** To be sure, until 1983 the Legislature had specifically denied relatives or dependents of an undocumented worker any workers' compensation benefits if the relatives and dependents were not residents of the United States. NMSA 1978, § 52-1-52 (1953, as recodified and amended through 1983). This legislative policy decision was the subject of the Supreme Court's opinion in *Pedrazza v. Sid Fleming Contractor, Inc.*, 94 N.M. 59, 607 P.2d 597 (1980), *superseded by statute* in the case at issue in this appeal, *Gonzalez v. Performance Painting, Inc.*, 2011-NMCA-025, ¶ 15, 150 N.M. 306, 258 P.3d 1098, *cert.*

12

*granted*, 2011-NMCERT-003, 150 N.M. 620, 264 P.3d 521.  In *Pedrazza*, Salvador Ontiveros was killed while working for Sid Fleming.  *Id.* at 61, 607 P.2d at 599.  The natural mother of his children, Carmen Pedrazza, pursued a claim for workers' compensation benefits on behalf of their children, all of whom were residents of the Republic of Mexico. *Id.*  In 1980, workers' compensation claims were litigated in district court.  The district court denied the claim, relying on the provisions of Section 52-1-52.  94 N.M. at 61, 607 P.2d at 599.  Pedrazza appealed, challenging the constitutionality of Section 52-1-52 on due process and equal protection grounds.  *Id.*  A majority of the Supreme Court upheld the constitutionality of Section 52-1-52, 94 N.M. at 62-63, 607 P.2d at 600-01, and closed its opinion by stating:

> This opinion does not deny plaintiffs other avenues of recovery.  The worker and his [or her] dependents are independent of and take separately from one another under the Act.  Therefore, the bar against using other legal remedies to recover for the injury or death of a worker cannot be raised against those dependents not covered by the Act.

*Id.* at 63, 607 P.2d at 601.  Implicit in this statement was that Pedrazza, or other dependents of a deceased undocumented worker who do not reside in the United States, could pursue a tort action against the employer, assuming that they could prove that the employer's negligence proximately caused the worker's injury or death.  The implication of an alternative remedy appears to have been a key rationale for a majority of this Court to have concluded that Section 52-1-52 did not deprive the dependents in *Pedrazza* of due process or equal protection.

**{45}**     Almost three years after *Pedrazza*, this Court was given the opportunity to expressly hold what it had implicitly stated in *Pedrazza*.  In *Kent Nowlin Construction Co. v. Gutierrez*, 99 N.M. 389, 658 P.2d 1116 (1983), Bernardo Talamantes, an undocumented worker, was killed while working for Kent Nowlin Construction Co.  *Id.* at 389, 658 P.2d at 1116.  Nowlin's workers' compensation carrier paid the medical and funeral expenses for Talamantes under the Workers' Compensation Act, NMSA 1978, Chapter 52, Article 1. *Kent Nowlin Constr. Co.*, 99 N.M. at 389, 658 P.2d at 1116.  Talamantes's relatives or dependents, who resided in the Republic of Mexico and were therefore not entitled to worker's compensation benefits, brought a wrongful death lawsuit against Nowlin.  *Id.*  A jury returned a verdict in favor of Talamantes's dependents.  *Id.*  The Court of Appeals affirmed the jury verdict, relying on the Supreme Court's opinion in *Pedrazza*, and specifically the language quoted above. *Gutierrez v. Kent Nowlin Constr. Co.*, 99 N.M. 394, 398, 403, 658 P.2d 1121, 1125, 1130 (Ct. App. 1981).  This Court granted Nowlin's petition for writ of certiorari and reversed the Court of Appeals.  *Kent Nowlin Constr. Co.*, 99 N.M. at 389, 658 P.2d at 1116.

**{46}**     A majority of this Court set aside the tort verdict holding that the Workers' Compensation Act provided the exclusive remedy for the Talamantes dependents, despite the fact that they were not residents of the United States, and were therefore precluded from

receiving any benefits under the Workers' Compensation Act. *Id.* at 390-91, 658 P.2d at 1117-18. There simply was no remedy available to the Talamantes dependents under the Workers' Compensation Act, much less an exclusive remedy. Thus, the effect of this Court's majority opinion was to deprive the Talamantes dependents of *any* remedy for the death of their loved one, despite a jury finding that Nowlin negligently took Talamantes's life.

**{47}** Perhaps it was purely coincidental, or perhaps as an effort to ameliorate the harshness of the result in *Nowlin*, in 1984 the Legislature, almost as if to emphasize its policy decision to make workers' compensation benefits available to undocumented workers, amended Section 52-1-52 to delete the language that deprived relatives or dependents who are not residents of the United States from recovering workers' compensation benefits when their loved one is injured or killed while working in New Mexico. *Compare* 1983 N.M. Laws, ch. 78, § 1, *with* 1984 N.M. Laws, ch. 95, § 1. This history supports the conclusion that the Legislature definitively has made the policy decision to allow undocumented workers to recover workers' compensation benefits when they are injured or killed during the course and scope of their employment with New Mexico employers. Although I question whether any undocumented worker should ever be deprived of modifier benefits based solely on his or her documented status, or for the reasons expressed in Justice Daniels's special concurrence, I believe that the opinion authored by Justice Bosson reasonably balances the policy of the New Mexico Legislature to grant workers' compensation benefits to undocumented workers and their dependents with the Immigration Reform and Control Act of 1986. I therefore concur.

_____

**EDWARD L. CHÁVEZ, Justice**

**DANIELS, Justice, specially concurring.**

**{48}** I concur in the ultimate holding of the majority, that Mr. Gonzalez is entitled to statutory modifier benefits, but I write separately to express my concerns about our having to create a new set of nonstatutory workers' compensation rules especially for undocumented workers.

**{49}** On its face, the plain language of Section 52-1-26(D) could not be more clear: A worker who is injured on the job, whether undocumented or not, is due full disability benefits until he actually *returns to work* earning at or above his pre-injury wage. *See* 1978 NMSA, § 52-1-26(D) (1990) ("If . . . an injured worker *returns to work* at a wage equal to or greater than the worker's pre-injury wage, the worker's permanent partial disability rating shall be equal to his impairment and shall not be subject to [modifications].") (emphasis added). Nothing in the statutory language or history makes an unaccepted job offer—whether reasonable or illusory—a substitute for this textual requirement. *See Gonzales v. Sharp & Fellows Contracting Co.*, 51 N.M. 121, 126, 179 P.2d 762, 765 (1947) ("We have said more than once that when the language of a statute is plain and unambiguous

there is no occasion to resort to the rules of statutory construction, and that such statute must be given its plain and obvious meaning."); *see also Sanchez v. Bernalillo County*, 57 N.M. 217, 226, 257 P.2d 909, 915 (1953) ("As has been said many times, it is not the province of the court, but of the legislature, to make changes in the provisions of statute law. Where the lawmaking body has specified clearly who shall be entitled to compensation benefits and under what circumstances, the court should not alter the conditions required to obtain such benefits."). On a straightforward plain language application of the statute, Mr. Gonzales was entitled to his modifier benefits until he actually returned to work at his pre-injury wage.

**{50}** The reason we are having to create new rules to substitute for the statutory text has its origins in *Jeffrey v. Hays Plumbing & Heating*, 118 N.M. 60, 64, 878 P.2d 1009, 1013 (Ct. App. 1994), which disregarded the plain language of Section 52-1-26(D) and instead applied the historical principle that "[i]n New Mexico, disability benefits are denied if a claimant, through voluntary conduct unconnected with his injury, takes himself out of the labor market.'") (quoting *Feese v. U.S. West Serv. Link, Inc.*, 113 N.M. 92, 94, 823 P.2d 334, 336 (Ct. App. 1991), and citing *Aranda v. Mississippi Chem. Corp.*, 93 N.M. 412, 414, 600 P.2d 1202, 1204 (Ct. App. 1979)). What *Jeffrey* failed to recognize was that only under the earlier version of the disability provision—which, for more than twenty years, defined disability based on the capacity to perform post-injury work—could the denial of benefits be justified when a worker refused to work. *See* NMSA 1953, § 59-10-12.19 (1965) (defining disability based on the "percentage-extent" of a worker's inability "by reason of injury arising out of . . . his employment . . . to perform any work for which he is fitted"); *accord Shores v. Charter Servs., Inc.*, 112 N.M. 431, 432, 816 P.2d 500, 501 (1991) ("[W]e agree that the 1963 amendment in the workers' compensation statute changed the test of disability . . . to capacity to perform work, and that to recover under the statute the worker had to show that she was wholly or partially unable to perform any work for which she was fitted."); *see also Medina v. Zia*, 88 N.M. 615, 616-17, 544 P.2d 1180, 1181-82 (denying disability benefits, based on the statutory language of the benefits provision, to a worker who chose not to work); *Aranda v. Mississippi Chem. Corp.*, 93 N.M. 412, 414-15, 600 P.2d 1202, 1204-05 (Ct. App. 1979) (applying *Medina* and holding that a worker was entitled to disability because he did not voluntarily leave his employment); *Feese*, 113 N.M. at 94, 823 P.2d at 336 (Ct. App. 1991) (applying *Aranda* under the 1987 version of the Act defining total disability in terms of the ability to return to work and holding that retirement alone did not necessarily establish voluntarily taking oneself out of the labor market).

**{51}** *Jeffrey* did not acknowledge the fact that recent amendments to the Act had abandoned the capacity to work theory in favor of paying a worker for the permanent

15

physical impairment suffered.[2] *See, e.g.*, *Varela v. Ariz. Pub. Serv.*, 109 N.M. 306, 307-08, 784 P.2d 1049,1050-51 (1989) (recognizing the Legislature's adoption of the current definition for permanent partial disability in 1986 based on the American Medical Association guides for physical impairment and that under this new definition, "partial disability is measured purely by the loss of physical function; loss of wages or earning power absolutely plays no part in the determination"); *see also Madrid v. St. Joseph Hosp.*, 1996-NMSC-064, ¶ 19, 122 N.M. 524, 928 P.2d 250 (explaining how the current disability formula is used to calculate impairment and to "award proportional compensation" (internal quotation marks and citation omitted)); *Smith v. Ariz. Pub. Serv. Co.*, 2003-NMCA-097, ¶ 15, 134 N.M. 202, 75 P.3d 418 ("Since the 1990 amendments to the Act, permanent disability is expressly defined in terms of impairment. . . . Permanent partial disability is calculated pursuant to a statutory formula and not in accordance with the worker's ability or inability to function at work.").

**{52}**    By improperly relying on an earlier interpretation of the Act that used now-repealed language to encourage employment and discourage dependence on disability benefits, the *Jeffrey* Court impermissibly perpetuated the conclusion that "[w]e would violate the policy of encouraging employment and independence from compensation benefits if we interpreted Section 52-1-26 to permit a worker to escape a reduction in benefits by voluntarily remaining unemployed or underemployed." *Jeffrey,* 118 N.M. at 64, 878 P.2d at 1013.

**{53}**    The WCA judge and the Court of Appeals in this case tried conscientiously to follow the judge-made policies created from whole cloth in *Jeffrey* and its progeny by holding that the worker had taken himself out of the legal job market by entering the country unlawfully. In order for us to reverse the WCA and COA without relying on the statute's plain language and acknowledging that the *Jeffrey* interpretation of the Act was wrong, we now have to create a new set of rules and exceptions for undocumented workers—based on new equitable concerns of compliance with federal law in a worker's initial hiring, none of which can be found anywhere in the plain language or expressed policies in the Act.  Granted, if one ignores the statutory text, our judicially-created policies, exceptions, and exceptions to exceptions seem like fair ways to deal with compensation for injured workers.  But judges are not legislators, and my discomfort arises from the reality that real legislators have not made those decisions.

**{54}**    On the other hand, the Legislature has not seen fit to amend the statute to address any perception on its part that the judicial branch has been misinterpreting the statutory purpose for almost two decades.  It may well be that the Legislature believes we are on the right

---

[2]Part of the difficulty in interpreting this provision is understanding its statutory history, including the numerous amendments made in 1986, 1987, 1989, and 1990 and the relevant caselaw interpreting these amendments. *See* 1965 N.M. Laws, ch. 295, §19; 1986 N.M. Laws, ch. 22, §§ 5, 12; 1987 N.M. Laws, ch. 235, § 12; 1989 N.M. Laws, ch. 263, § 18; and 1990 N.M. Laws 2nd Sess., ch. 2, § 11.

16

track, and perhaps we should stay the course until we hear otherwise from our colleagues in the legislative branch. The *Jeffrey* approach, rightly or wrongly, has become an integral part of our workers' compensation administrative law and jurisprudence. It is also significant that no party has made a principled argument in this case for our disregarding the principles of stare decisis and reversing long-standing precedent. *See State v. Swick*, 2012-NMSC-018, ¶ 17, 279 P.3d 747 (detailing factors that should be addressed by a litigant seeking to reverse existing precedent). The *Jeffrey* line of precedent, including the majority Opinion in this case, therefore remains the controlling interpretation of the statutory policies we honor in applying the provisions of the Act.

_____

**CHARLES W. DANIELS, Justice**